**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Angelo PEPE and Thomas Miglionico,
Defendants-Appellants.**

**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Albert Joseph FACCHIANO, Francis
Santo, Paul Santo,
Defendants-Appellants.**

**Nos. 81–5453, 81–5965.**

United States Court of Appeals,
Eleventh Circuit.

Nov. 28, 1984.

cellation date earlier than ... the date specified in [the insurer's] own notice of cancellation."

636

Joseph Mincberg, Lubin & Mincberg, West Palm Beach, Fla., for Pepe.

Federico A. Moreno, Miami, Fla. (Court-appointed), for Miglionico.

Joseph Beeler, Miami, Fla., for Facchiano.

David Lenihan, Albany, N.Y., for F. Santo and P. Santo.

William C. Bryson, Robert J. Erickson, Washington, D.C., for U.S.

Before GODBOLD, Chief Judge, TJOFLAT and HENDERSON, Circuit Judges.

TJOFLAT, Circuit Judge:

Albert "Chink" Facchiano, Thomas Miglionico, Angelo Pepe, Francis "Jigger" Santo, and Paul Santo were convicted under the Racketeer Influenced and Corrupt Organizations (RICO) statute, 18 U.S.C. § 1961–68 (1982), for conducting loan sharking activities in southern Florida. In this consolidated appeal, they question the legal sufficiency of the indictment to charge one of the RICO offenses and of the evidence to support their multiple convictions. They also question several of the trial judge's rulings made prior to, during, and after the trial.

We conclude that the allegations of the indictment were sufficient to charge the RICO offense in question and that the evidence proved each of the offenses charged against appellants, except the one charged against Francis "Jigger" Santo in count five of the indictment. We also conclude that the trial judge did not err in making the pretrial, trial, and post-trial rulings that appellants question. Accordingly, except as to Francis Santo's conviction on count five, we affirm.

### I.

#### A. *The Factual Background*

From January 1, 1973 through December 1975, Alexander Heller, Howard Horowitz, Sanford Rafsky, and Herbert Zucker ("the partners" and primary victims of appellants' loan sharking activities) were owners and officers of Z & H, Inc. (Z & H), which manufactured ladies' sportswear in Hialeah, Florida. The partners formed Z & H in late 1972. Rafsky was its president, although his name did not appear on Z & H's corporate documents because he had recently declared bankruptcy. In January 1973, the partners traveled to Las Vegas to obtain cash from casinos with which to capitalize Z & H. Heller, Horowitz, and Rafsky procured $35,000 in credit from the Aladdin Hotel, gambled briefly, cashed their chips and returned to Florida, owing approximately $32,000 to the hotel.[1] The following May, two "strong, burly-looking" men from Las Vegas arrived at Z & H's Hialeah plant and threatened the partners with physical harm[2] unless they paid their debt to the Aladdin Hotel. At this point Angelo Pepe, Z & H's plant superintendent, interceded on behalf of the partners. Pepe took the two men aside for a chat and they left shortly thereafter, stating that Pepe was a "good friend." Rafsky then gave Pepe a check for $5,000 to settle the $32,000 debt in full. Pepe took the check, telling the partners that it was for "Chink" (Facchiano) who apparently had sufficient influence to cancel the debt to the casino.[3]

---

1. Of this $32,000, approximately $16,000 went into Z & H. The partners had to pay one-half of the money advanced by Aladdin to the person who secured the line of credit. The partners were under the impression that the debt to Aladdin would not be collected.

2. Heller, Horowitz, and Rafsky were the primary targets of the threat.

3. The check was endorsed "Angelo Pepe, for deposit only to the Account of the Fontainbleau Hotel." The testimony linking Facchiano to the

By mid-1973, Z & H could not pay its bills and was unable to secure bank loans. Z & H's financial difficulties were the genesis for the crimes committed in this case. The partners borrowed money from, and were victimized by, two groups of loan sharks. The first group, consisting of appellant Albert "Chink" Facchiano and his lieutenant, Vincent "Terry" Terriacca, made two extortionate loans to the partners. The second group, headed by appellant Francis "Jigger" Santo and staffed by two enforcers, appellants Thomas Miglionico and Paul Santo, made three loans to the partners. Both groups employed appellant Angelo Pepe as a loan solicitor, collection agent, and enforcer. The two groups also combined their resources to extort loan payments from the partners.

When Z & H became strapped for cash, Pepe told the partners that he could obtain "shylock loans," setting the stage for the partners' first contact with the loan sharking group. The partners expressed interest, and Pepe introduced Herbert Zucker to Terriacca, Facchiano's lieutenant, in Miami. Terriacca told Zucker that he was in the business of loaning money at high interest rates, and he offered to loan the partners $10,000 at three percent interest per week. Terriacca warned Zucker that the partners would suffer severe consequences if they failed to pay off the loan. The three men parted without negotiating a loan; Pepe cautioned Zucker that "those people don't play games.". Thereafter, Rafsky asked Pepe to try to negotiate a lower interest rate. Pepe and Zucker met Terriacca again, and Terriacca, acceding to Pepe's request, told Zucker that the interest rate would be two percent per week. The parties agreed to a $10,000 loan at that rate, and Terriacca warned Zucker, "I don't want you to get hurt, so pay it back on time." Before the loan closed, Pepe cautioned Zucker that "this is a tough, hard organization, and be sure to pay back the loan, otherwise [someone would] get hurt." He also told Zucker that Terriacca was a lieutenant for "Chink" (Facchiano), who operated the largest "shylocking" operation in south Florida for an organized crime "family." They closed the loan in July 1973 at a third meeting, arranged by Pepe. Terriacca instructed Zucker to pay the loan off through Pepe in ten weekly installments. The partners paid off the loan, as scheduled, through Pepe.

Z & H continued to have financial difficulties, and in late 1973 the partners asked Pepe if he could arrange another loan. This time Pepe went to Francis "Jigger" Santo, a South Florida bookmaker, and obtained a $20,000 loan, at an interest rate of one and one-half percent per week, payable in weekly installments of $2,000. Pepe gave the partners $18,000 of the loan proceeds and, with their acquiescence, kept $2,000 as a commission. The partners used $15,000 of the money to purchase two thoroughbred race horses named "Jigger's Gal" and "Sew for Four." "Sew for Four" was a success, and the partners paid Pepe some of the interest due on the Santo loan.

In February 1974, the partners got Pepe to obtain a second loan from Francis Santo, $25,000 at an interst rate of two and one-half percent per week payable in cash through Pepe. The first Santo loan was still unpaid, so Rafsky gave Santo a $50,000 check as collateral to cover both loans. Francis Santo warned the partners that they would get hurt if they failed to pay off the loans. Pepe also told Rafsky that "things [will] get rough if you don't get the payments made on time." To ensure that the partners' payments would be forthcoming, Francis Santo made the partners hire Thomas Miglionico as a laborer in Z & H's plant, so that Miglionico could "watch [Santo's] money."

Z & H's cash flow problems continued, and on June 25, 1974 Pepe arranged a third loan from Francis Santo for $20,000 at three percent interest per week, again payable weekly through Pepe. As before, Pepe gave the partners $18,000 of the proceeds and kept $2,000 as a commission. The partners used the $18,000 to buy fabric. Later that month Pepe obtained on

Las Vegas incident was later stricken by the district court.

behalf of the partners, through Terriacca, a second Facchiano/Terriacca loan for between $15,000 and $20,000, at three percent interest per week.

By August 1974, the partners were substantially in arrears on the three Santo loans and the second Facchiano/Terriacca loan. Terriacca harassed Rafsky frequently, often coming to Z & H's plant, but Rafsky still made no payments on the loans. Francis Santo told Rafsky that unless payment was forthcoming he would break Rafsky's legs or tear his eyes out. Santo offered to take the race horses in lieu of payment. Pepe and Miglionico also pressured the partners. Pepe told them to pay up because he was "being hounded by Terriacca and Chink [Facchiano]"; Miglionico said that he would protect Francis Santo's interests at all costs.

Fearing for his safety, Rafsky fled to New York. Soon after his arrival, however, Paul Santo, Francis Santo's son, who lived in Massachusetts, began calling Rafsky demanding that he make payments on his father's loans. Finally, in January 1975, Rafsky agreed to meet with Paul Santo at a steak house in New York City to discuss the Francis Santo loans. Rafsky took three friends with him to the meeting for protection. At the meeting, Paul Santo, warning Rafsky that he became violent when he lost his temper, demanded that Rafsky pay $75,000 in satisfaction of the Francis Santo loans. The next day Rafsky offered Paul Santo a $5,000 check as partial payment, but Santo refused to take the check, demanding that Rafsky pay in cash. Shortly thereafter Rafsky sent Paul Santo $5,000 in cash through Edward Vanasco, one of Santo's friends. This partial payment, however, did not diminish the Santos' collection efforts. The Santos and Pepe made threatening phone calls to Rafsky, prompting Rafsky to pay Paul Santo an additional $2,500 in cash. Rafsky also had a friend give Paul Santo two small cash payments. Paul Santo and Rafsky subsequently met for a second time in a New York City restaurant. Rafsky again came with three friends; Santo brought Vanasco and Pepe. After a heated argument Raf-

sky agreed that he still owed Francis Santo $65,000.

When the partners failed to make any further payments, Paul Santo told Rafsky to meet him again in New York City, this time at the Essex House. The meeting was held on September 23, 1975, but Rafsky failed to appear because he feared for his safety. Instead, he sent two friends, Norman Kops and Lionel Reifler. They met with Paul Santo, Vanasco, and Facchiano, who had traveled to New York City from South Florida to attend the meeting. Facchiano opened the meeting by complaining bitterly about the money the partners owed him for the second Facchiano/Terriacca loan. Paul Santo then demanded that the balance due on the Santo loans be paid off; he stated that he would accept either cash or the partners' horses in satisfaction of the loans. He told Kops and Reifler that he would shoot "Sew for Four" or break its legs; he would also break Rafsky's legs and kidnap his wife and children if payment was not made. Santo then grabbed Reifler by the throat, letting go when Facchiano intervened. As the meeting came to a close, Facchiano told Paul Santo that he could do "whatever he wished." As far as Facchiano was concerned, Santo and Vanasco could assume the collection of his loan. Kops and Reifler told Facchiano and Santo that they would relay their messages to Rafsky. After the meeting, Facchiano told Santo and Vanasco that he was optimistic that everyone would get paid; he had spoken with the trainer of the partners' race horses and learned that "Sew for Four" had been winning large purses.

In October 1975, Rafsky returned to Miami with a friend, Vincent Carrano. On October 23 they went to Calder Race Track where, by chance, they encountered Francis Santo. Santo pushed Rafsky, spat at him and vowed to "break [his] legs, when [he] got out of the hospital, break them again, until [he] became a rat." Carrano mollified Santo, promising him that he would be paid. That evening, Francis Santo placed a call to Rafsky. Carrano an-

swered the telephone and told him that Rafsky could not meet him the next day because they were traveling to Fort Myers, Florida. The following afternoon, after returning from Fort Myers, Rafsky and Carrano stopped by the racetrack to place a few bets. Pepe happened to see them there, but avoided any contact with them. Later, as Rafsky and Carrano were leaving the track, they encountered Miglionico. He told Rafsky to follow him because "Jigger wants to see you." Rafsky refused, and Miglionico beat him in the face and punched Carrano. He then ran off but was immediately apprehended by a security guard who saw the incident. Meanwhile, Rafsky was taken to a nearby hospital.

He lost six teeth and eventually fifty percent of the vision in one eye and ten percent in the other.

## B. The Indictment and Trial

On June 21, 1979, a grand jury in the Miami Division of the Southern District of Florida returned a seven-count indictment against Facchiano, Miglionico, Pepe, Francis Santo, Paul Santo, and Terriacca.[4] Count one charged all defendants with violating 18 U.S.C. § 1962(d) (1982)[5] by conspiring from June 1973 to October 1975 to violate section 1962(c) of the RICO statute. Section 1962(c) prohibits participation in the affairs of an interstate loan sharking enterprise through a pattern of racketeering activity[6] or collection of unlawful debt.[7]

---

**4.** All counts against Terriacca were later severed for a separate trial and are not in issue here.

**5.** Section 1962 lists "prohibited activities." The subsections germane to this appeal state:

> (b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

> (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.

**6.** 18 U.S.C. § 1961(1) (1982) provides:

"[R]acketeering activity" means (A) any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, or dealing in narcotic or other dangerous drugs, which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code: Section 201 (relating to bribery), section 224 (relating to sports bribery), sections 471, 472 and 473 (relating to counterfeiting), section 659 (relating to theft from interstate shipment) if the act indictable under section 659 is felonious, section 664 (relating to embezzlement from pension and welfare funds), sections 891–894 (relating to extortionate credit transactions), section 1084 (relating to the transmission of gambling information), section 1341 (relating to mail

fraud), section 1343 (relating to wire fraud), section 1503 (relating to obstruction of justice), section 1510 (relating to obstruction of criminal investigations), section 1511 (relating to the obstruction of State or local law enforcement), section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering), section 1953 (relating to interstate transportation of wagering paraphernalia), section 1954 (relating to unlawful welfare fund payments), section 1955 (relating to the prohibition of illegal gambling businesses), sections 2314 and 2315 (relating to interstate transportation of stolen property), sections 2341–2346 (relating to trafficking in contraband cigarettes), sections 2421–24 (relating to white slave traffic), (C) any act which is indictable under title 29, United States Code, section 186 (dealing with restrictions on payments and loans to labor organizations) or section 501(c) (relating to embezzlement from union funds), or (D) any offense involving fraud connected with a case under title 11, fraud in the sale of securities, or the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotic or other dangerous drugs, punishable under any law of the United States;

A "pattern of racketeering activity," as required by the statute contemplates at least two acts of racketeering activity. The acts may not be more than 10 years apart, and at least one of them must have occurred after the RICO enactment date, October 15, 1970. *Id.* at § 1961(5).

**7.** *See infra* note 49. The statute defines "unlawful debt" as

a debt (A) incurred or contracted in gambling activity which was in violation of the law of the United States, a State or political subdivision thereof, or which is unenforceable under State or Federal law in whole or in part as to

Count one listed twenty-nine overt acts the conspirators allegedly committed in furtherance of their conspiracy.[8]

■ Count two of the indictment charged all six defendants with violating 18 U.S.C. § 1962(c) (1982),[9] a substantive section of the RICO statute, by participating in the conduct of an enterprise in one or both of two ways: through a pattern of racketeering activity or through the collection of unlawful debt.[10] To establish a pattern of racketeering at least two predicate acts of racketeering activity must be shown;[11] to establish the collection of unlawful debt only one act of collection must be shown. The acts of racketeering activity and collections of unlawful debt alleged in the indictment are crucial to this appeal, and we describe them extensively in the margin.[12] Count two listed eleven separate

principal or interest because of the laws relating to usury, and (B) which was incurred in connection with the business of gambling in violation of the law of the United States, a State or political subdivision thereof, or the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate. *Id.* at § 1961(6). Count one alleged that the loans were usurious under state law.

8. Overt acts are not required to find a conspiracy to violate RICO, however. *See United States v. Coia,* 719 F.2d 1120, 1123 (11th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 2349, 80 L.Ed.2d 822 (1984). *See generally* P. Marcus, Prosecution and Defense of Criminal Conspiracy Cases § 4.02(2)(d) (1983 Supp.).

9. *See supra* note 5. To show a substantive RICO violation the government must prove (1) that a person (2) conducted a pattern of racketeering activity or engaged in collection of an unlawful debt (3) directly or indirectly through (a) investment in (b) maintenance of an interest in, or (c) participation in (4) an enterprise, (5) the activities of which affect interstate commerce. *See also United States v. Phillips,* 664 F.2d 971 (5th Cir. Unit B 1981), *cert. denied,* 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354, 459 U.S. 906, 103 S.Ct. 208, 74 L.Ed.2d 166 (1982).

10. *See supra* note 5. "Unlawful debt" is defined by section 1961(b). *See supra* note 7. "Enterprise" is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not in legal entity." *Id.* at § 1961(4). *See also United States v. Hewes,* 729 F.2d 1302 (11th Cir.1984) (defining RICO enterprise).

11. *See supra* note 6.

12. The eleven alleged acts of racketeering were: (a) The first Facchiano/Terriacca loan, July 1973 in the Southern District of Florida, where Facchiano, Terriacca, and Pepe made an extortionate extension of credit—as defined by 18 U.S.C. § 891(6), and proscribed by *id.* at § 892—to the partners.

(b) Collection of the first Facchiano/Terriacca loan, August-November 1973 in the Southern District of Florida, where Facchiano, Terriacca, and Pepe used "extortionate means," *id.* at § 891(7), to collect, in violation of *id.* at § 894:

| Date | Amount |
| --- | --- |
| August 3, 1973 | $2,000.00 |
| August 17, 1973 | 3,500.00 |
| August 23, 1973 | 6,300.00 |
| November 1, 1973 | 1,000.00 |

(c) The first Santo loan, December 1973, in the Southern District of Florida, where Francis Santo and Pepe made extortionate extensions of credit to the partners.

(d) Collection of the first Santo loan, January-July 1974 in the Southern District of Florida, where Francis Santo and Pepe used extortionate means, in violation of *id.* at § 894, to collect:

| Date | Amount |
| --- | --- |
| January 28, 1974 | $ 360.00 |
| February 14, 1974 | 500.00 |
| April 25, 1974 | 1,000.00 |
| June 14, 1974 | 845.00 |
| July 19, 1974 | 600.00 |
| July 25, 1974 | 665.00 |

(e) The second Santo loan, February 1974, in the Southern District of Florida where Francis Santo and Pepe made extortionate extensions of credit to the partners, a violation of *id.* at § 892.

(f) Collection of the second Facchiano/Terriacca loan, throughout 1974 in the Southern District of Florida, where Pepe and Terriacca used extortionate means, in violation of *id.* at § 894, to collect and attempt to collect from Rafsky.

(g) Use of extortionate means by Miglionico to collect and attempt to collect credit from Sanford Rafsky in the Southern District of Florida in 1974, concerning violation of *id.* at § 894.

(h) Use of extortionate means by Francis Santo to collect credit from Sanford Rafsky in the Southern District of Florida in 1974, in violation of *id.* at § 894.

(i) Francis Santo in the Southern District of Florida in 1974 caused Angelo Pepe to travel in interstate commerce in aid of racketeering,

acts of racketeering activity and also incorporated counts three through seven as additional acts of racketeering. All of these racketeering acts dealt with loan sharking: the extortionate extension of the five loans we have described *supra* in subpart A, the separate use of extortionate means, threats, and assaults to collect the loans, and travel in interstate commerce for the purpose of using extortionate means to collect them. Count two also listed ten different acts of collection or attempted collection of unlawful debt by the appellants. All of these acts stemmed from the appellants' efforts to collect the five loans we have described.[13]

Count three charged Pepe and Francis Santo with violating 18 U.S.C. § 892 (1982), for making the third Santo loan of $18,000 on June 25, 1974, which allegedly was an extortionate extension of credit. Count four charged Terriacca with violating section 892 by making the first Terriacca loan of $10,000 in July 1973. Count five charged Facchiano with violating the Travel Act, 18 U.S.C. § 1952(a)(3) (1982), by traveling in interstate commerce (to the Essex House meeting in New York City) for unlawful purposes (to force payment). It also charged Francis Santo, Paul Santo, and Terriacca with aiding and abetting that violation. *See* 18 U.S.C. § 2 (1982). Count six charged Francis Santo with violating 18 U.S.C. § 894 (1982), by using extortionate means to collect credit from Rafsky on October 23, 1975, the day before the Calder Race Track assault. Count seven charged Miglionico with violating the same statute on October 24, 1975, the day he assaulted Rafsky at the racetrack.

Shortly after the grand jury returned its indictment, the district court, on its own motion, transferred the case pursuant to Fed.R.Crim.P. 18 from its Miami Division to its West Palm Beach Division and then to its Fort Lauderdale Division, which is

---

a violation of the Travel Act, 18 U.S.C. § 1952 (1982).

(j) In 1975, in the Southern District of New York, Pepe, Paul Santo, and Francis Santo used extortionate means to collect and attempt to collect credit from Sanford Rafsky, a violation of *id.* at § 894.

(k) In September 1975, in the Southern District of New York, Facchiano and Paul Santo, aided and induced by Francis Santo and Terriacca, used extortionate means to collect and attempt to collect credit from Sanford Rafsky, a violation of *id.* at § 894.

Besides the foregoing 11 acts of racketeering activity, count two of the indictment incorporated counts three through seven as additional acts of racketeering activity. Thus the acts of racketeering activity alleged against each defendant were as follows:

Facchiano—Acts (a), (b), and (k), *supra,* and acts alleged in count five of the indictment (Travel Act count for travel from Miami to New York for racketeering purposes).

Miglionico—Act (g), *supra,* and acts alleged in count seven of the indictment (use of extortionate means to collect credit on October 24, ·1975, when Miglionico assaulted Sanford Rafsky).

Pepe—Acts (a), (b), (c), (d), (e), (f), (i), (j), *supra,* and acts alleged in count three of the indictment (extortionate extension of credit, the third Santo loan, on June 25, 1974).

Francis Santo—Acts (c), (d), (e), (h), (i), (j), (k), *supra,* and acts alleged in indictment counts three (third Santo loan), five (Travel Act violation for causing Facchiano to travel to New York for racketeering purposes), six (use of extortionate means to collect credit from Rafsky on the day before the Miglionico assault), and seven (causing Miglionico to use extortionate means to collect the Santo loans from Rafsky on October 24, 1975, the day of the assault).

Paul Santo—Acts (j) and (k), *supra,* and acts alleged in count five (Travel Act violation for causing Facchiano to travel to New York for racketeering purposes).

Count seven of the indictment charged Francis Santo with aiding and abetting Miglionico's use of extortionate means to collect credit. This conduct served only as a predicate act at trial, and the jury did not adjudicate Santo's guilt or innocence on this issue.

**13.** The acts supporting collection of unlawful debt by each defendant were:

Facchiano—Acts of racketeering (b) and (k), *supra* note 12, and acts alleged in count five of the indictment.

Miglionico—Act of racketeering (g), *supra* note 12, and acts alleged in count seven of the indictment.

Pepe—Acts of racketeering (b), (d), (f), and (j), *supra* note 12.

Francis Santo—Acts of racketeering (d), (h), (j), and (k), *supra* note 12, and acts alleged in counts five and seven of the indictment.

Paul Santo—Acts of racketeering (j) and (k), *supra* note 12, and acts alleged in count five of the indictment.

closer to Miami, due to the congested state of the Miami docket. Facchiano and Terriacca thereafter moved for a severance of parties. The court granted Terriacca's motion and tried him separately. The remaining defendants, prior to the trial, requested that the court hold a *James* hearing, *see United States v. James,* 590 F.2d 575 (5th Cir.) (en banc), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979), to determine the admissibility of the evidence the government intended to offer at trial. The court acceded to their request and scheduled the hearing. The court continued the hearing, however, when Francis Santo became ill. He remained ill, and the court finally decided to hold the hearing in his absence. The *James* hearing lasted thirteen days. Francis Santo's attorney attended it throughout, and Santo appeared toward the end.

The appellants' trial before a jury in Fort Lauderdale started in late November 1980 and lasted five weeks. The government established the facts we have related *supra* in subpart A. Rafsky, Zucker, and Rafsky's New York associates testified for the government and underwent extensive cross-examination. Gary Bowdach, a former racketeer and frequent government witness, also testified. The jury found Facchiano guilty on counts one, two, and five; Miglionico not guilty on count one but guilty on counts two and seven; Pepe guilty on counts one, two, and three; Francis Santo guilty on counts one, two, three, five, and six; and Paul Santo guilty on counts one, two, and five.

In this appeal, appellants make a number of challenges, including the sufficiency of count two of the indictment, the correct-

ness of the trial judge's disposition of their pretrial motions, the sufficiency of the evidence, and the correctness of various evidentiary rulings.[14] For convenience, we consider these challenges in the following order. In Part II, we address the pretrial rulings; in Part III, we address the sufficiency of the evidence and the evidentiary rulings appellants question; and in Part IV, we address the sufficiency of count two of the indictment and the remaining claims of error.

## II.

### A. *Transfer to the Fort Lauderdale Division*

Appellants claim that transfer of the *James* hearing and jury trial from the Miami Division to the Fort Lauderdale Division violated their rights under Fed.R. Crim.P. 18.[15] Rule 18 provides in part:

[T]he prosecution shall be had in a district in which the offense was committed. The court shall fix the place of trial within the district with due regard to the convenience of the defendant and the witnesses *and the prompt administration of justice.*

(emphasis added). The appellants claim that the district court, in transferring the case to the Fort Lauderdale Division and subsequently denying their motions to return the case to Miami, acted arbitrarily because the transfer benefited only the government and did not give "due regard" to their convenience. We find no merit in their claim.

Rule 18 was amended on August 1, 1979, to add the phrase "and the prompt administration of justice." The pre-1979 Rule 18,

---

14. Appellants have adopted each other's arguments on appeal pursuant to Fed.R.App.P. 28(i), which states in part:

> (i) **Briefs in Cases Involving Multiple Appellants or Appellees.**
>
> In cases involving more than one appellant or appellee, including cases consolidated for purposes of the appeal, any number of either may join in a single brief, and any appellant or appellee may adopt by reference any part of the brief of another. Parties may similarly join in reply briefs.

15. Appellants certainly have no constitutional rights to venue or vicinage within a division. Article III, § 2, cl. 3 of the U.S. Constitution places venue "in the state where said crimes shall have been committed." Const. amend. VI states in relevant part, "In all criminal prosecutions, the accused shall enjoy the right to a ... trial ... by an impartial jury of the state and district wherein the crime shall have been committed."

as interpreted by the former Fifth Circuit,[16] authorized a district court to transfer a case to a division other than the one where the offense was committed *only* for the convenience of the defendant and witnesses. *Dupoint v. United States*, 388 F.2d 39, 43 (5th Cir.1968). The *Dupoint* interpretation of Rule 18 caused problems with the Speedy Trial Act, which was intended to " 'permit the trial of a case at any place within the judicial district.' " Rule 18 advisory committee note (quoting H.R.Rep. No. 93–1508, 93d Cong., 2d Sess. 29 (1974)). To resolve these problems Congress passed the 1979 amendment.

Rule 18 does not "encompass an absolute right on the part of [a defendant] to be tried in the division of his choice." *Houston v. United States*, 419 F.2d 30, 33 (5th Cir.1969). Rather, a defendant's only right is that the trial court give "due regard" to the convenience of the defendant and the witnesses when setting a place for trial. *United States v. Burns*, 662 F.2d 1378, 1382 (11th Cir.1981); *United States v. McRary*, 616 F.2d 181, 185 (5th Cir.1980), *cert. denied*, 456 U.S. 1011, 102 S.Ct. 2306, 73 L.Ed.2d 1307 (1982); *United States v. Lewis*, 504 F.2d 92, 98 (6th Cir.1974), *cert. denied*, 421 U.S. 975, 95 S.Ct. 1974, 44 L.Ed.2d 466 (1975). Here, the record indicates that the trial judge gave due regard to the desires of the appellants to be tried in Miami. After scheduling the trial for West Palm Beach, the court moved the trial to Fort Lauderdale, a place much closer to Miami, in an effort to satisfy their needs.

In this case, the Rule 18 requirement of "prompt administration of justice" overrode the appellants' desire for absolute convenience. Courtroom space in the Miami Division had been exceedingly scarce for at least a year prior to trial. Waiting for space or wedging the five-week trial into the Miami calendar would have needlessly delayed the trial and also could have disrupted the Miami docket. Appellants claim that a courtroom opened up at the last minute in Miami; but an eleventh-hour transfer would have involved further delay, and a sizeable jury panel had already been summoned in Fort Lauderdale. Moreover, three of the five defendants resided out of state, as did most of the witnesses. They were not greatly inconvenienced by traveling to Fort Lauderdale instead of Miami. The district judge did not abuse his Rule 18 discretion in designating the place for trial.

### B. *Composition of the Jury*

▪ Appellants claim that the system for choosing the grand jury venire in the Fort Lauderdale Division of the Southern District of Florida violated their right to a grand jury representing a fair cross section of the community, created by the sixth amendment and the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861 (1982).[17]

---

**16.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

**17.** Const. amend. VI states in relevant part, "In all criminal prosecutions, the accused shall enjoy the right to a ... trial ... by an impartial jury of the State and district wherein the crime shall have been committed...." The Supreme Court has interpreted this amendment to require that juries be composed of a fair cross section of the community. *Taylor v. Louisiana*, 419 U.S. 522, 530, 95 S.Ct. 692, 697–98, 42 L.Ed.2d 690 (1975).

The Jury Selection and Service of 1968, 28 U.S.C. §§ 1861–69 (1982), provides for the random selection of grand and petit jurors from a fair cross section of the community in the district or division wherein the court convenes. Pursuant to a written plan promulgated under 28 U.S.C. § 1863 (1982), the names of potential jurors are randomly selected from voter lists and placed in a master jury wheel. The court may adopt other sources of names in addition to voter lists where necessary to secure a fair cross section of the community. From time to time the court publicly draws at random from the master jury wheel the names of as many persons as may be required for jury service. The people selected in the second drawing receive juror qualification forms which they must complete and return to the clerk of the court. The court determines solely on the basis of information provided on the juror qualification form and other competent evidence whether a person is unqualified for, or exempt, or is to be excused from jury service. Reasons for disqualification include the lack of citizenship, conviction of a felony, and inability to understand the English language. The test for a sixth amendment fair cross-section violation applies in determining a violation of the statutory fair cross-

They contend that the Division's practice of filling the master jury wheel exclusively from voter registration lists rather than supplementing the wheel with names from other sources produced an unconstitutional underrepresentation of blacks. We disagree.

To establish a prima facie violation of the sixth amendment's fair cross-section requirement, a defendant must show (1) that the excluded group is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to the systematic exclusion of the group in the jury selection process. *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979). If a defendant fails to establish any of these elements he has failed to establish a prima facie violation of the sixth amendment. We limit our review to the second element of *Duren*, whether the representation was fair and reasonable, because it is dispositive here. To determine whether the representation was fair and reasonable, we are only concerned with the "absolute disparity" produced by the selection process.[18] *United States v. Maskeny*, 609 F.2d 183, 190 (5th Cir.1980) (rejecting comparative disparity and standard deviation analysis); *United States v. Butler*, 611 F.2d 1066, 1069–70 (5th Cir.), *reh'g denied*, 615 F.2d 685, 686 (1980) (other statistical methods not necessary when small absolute disparity shown and minority more than ten percent of population). The relevant comparison for sixth amendment fair cross-section purposes is the comparison between the percentage of the "distinctive group" on the qualified wheel and the percentage of the "distinctive group" among the population eligible for jury service. *See United*

section requirement. *United States v. Perez-Hernandez*, 672 F.2d 1380 (11th Cir.1982).

**18.** We consider deviation from proportional representation in absolute rather than comparative terms for sixth amendment no fair cross-section purposes, because the relative measure may distort the significance of the deviation.

*States v. Esle*, 743 F.2d 1465, 1478 (11th Cir.1984) (Tjoflat, J., concurring). The district court found a 7.6 percent absolute disparity between the proportion of blacks among all the persons eligible for jury service in the Fort Lauderdale Division (11.3 percent) and the percentage of blacks on the master wheel (3.7 percent). *United States v. Facchiano*, 500 F.Supp. 896, 898 (S.D.Fla.1980). Although the district court used the master wheel rather than the qualified wheel for comparative purposes, the disparity derived from this comparison was at least as great as that which would have been derived from the proper comparison. Because the disparity found by the district court was well within the absolute disparity limits set by this circuit, appellants failed to establish the second element of a prima facie sixth amendment fair cross-section violation, *e.g., Butler*, 611 F.2d at 1069–70; *Maskeny*, 609 F.2d at 190–91, and the trial judge committed no error in rejecting their claim.

### C. *Severance*

▮▮▮ Facchiano, Francis Santo, and Paul Santo contend that the trial court committed reversible error when it refused to grant their motions for severance, made both before and during the trial. Fed.R. Crim.P. 14 requires a trial court to balance the rights of the defendants and the government to a trial that is free from the prejudice that may result from joint trials against the public's interest in efficient and economic administration of justice. *United States v. Hewes*, 729 F.2d 1302, 1318 (11th Cir.1984). It permits the court, in its discretion, to sever either defendants or counts in an effort to eliminate the prejudice caused by joinder. An appellate court will only reverse a trial court's denial of severance under Rule 14 for an abuse of discretion. *Id.* (citing cases).

*See Foster v. Sparks*, 506 F.2d 805, 834–35 (5th Cir.1975). In this case, for example, the comparative disparity is 67.3 percent. *See generally* Beale, "Integrating Statistical Evidence and Legal Theory to Challenge the Selection of Grand and Petit Jurors," *Law & Contemp. Probs.* Autumn 1983, at 269.

▆▆▆▆▆ To show that the trial court abused its discretion, appellants must demonstrate that they suffered "compelling prejudice" as a result of the judge's refusal to grant their motion to sever. *United States v. Capo*, 693 F.2d 1330, 1335 (11th Cir.1982), *cert. denied*, 460 U.S. 1092, 103 S.Ct. 1793, 76 L.Ed.2d 359 (1983). Appellate courts are reluctant to second-guess trial court refusals to grant a severance. *United States v. Phillips*, 664 F.2d 971, 1017 (5th Cir. Unit B 1982) (citing cases), *cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982); *see also United States v. DeSimone*, 660 F.2d 532, 539 (5th Cir. Unit B 1981) (appellant must demonstrate compelling prejudice which could not be alleviated by the trial court and that he was unable to obtain a fair trial), *cert. denied*, 455 U.S. 1027, 102 S.Ct. 1732, 72 L.Ed.2d 149 (1982). Finally, it should be noted that coconspirators should normally be tried jointly, *United States v. Wilson*, 657 F.2d 755, 765 (5th Cir.1981), *cert. denied*, 455 U.S. 951, 102 S.Ct. 1456, 71 L.Ed.2d 667 (1982), and the fact that a defendant may have participated in only a single aspect of the conspiracy does not, by itself, warrant severance. *United States v. Marszalkowski*, 669 F.2d 655, 659–60 (11th Cir.), *cert. denied*, 459 U.S. 906, 103 S.Ct. 208, 74 L.Ed.2d 167 (1982). With these principles firmly in mind, we consider Facchiano's and the Santos' motions for severance.

### 1. Facchiano's Severance Motions.

Facchiano contends that the district court's denial of his repeated motions for severance of parties violated his rights under Rule 14 and the due process clause of the fifth amendment and his right under the sixth amendment to compulsory process for obtaining witnesses in his favor.

Facchiano claimed in his initial motion that, if he were tried separately, both Francis and Paul Santo would testify on his behalf. The trial court convened an evidentiary hearing on the severance issue, at which it received testimony from Paul Santo. The court also considered affidavits from both Santos and Paul Santo's grand jury testimony. The gist of the testimony was that neither Santos had made extortionate loans or attempted to collect them, and that neither was part of a group that did so. Additionally, the Santos testified that neither knew of any loan sharking group and that to their knowledge Facchiano was not associated with any such group. Finally, both Santos stated that they had never asked Facchiano to travel to New York City for a meeting at the Essex House; Paul Santo stated, "I don't know if I know [Facchiano]."

The district court, in a written order, found that there was "some likelihood" the Santos would testify for Facchiano if he were tried separately but that

> the bulk of the Santos' proffer [was] exculpatory to them but neutral as to Facchiano. With regard to Facchiano, the tenor of the testimony is that *to their knowledge* Facchiano did not do or was not involved in certain things. This tends to be equivocal with regard to the wide range of activities charged in the indictment and in no way negates Act[s] of Racketeering [alleged against Facchiano].

(emphasis in original). Accordingly, the court refused to sever Facchiano from the case.

▆▆▆▆ Facchiano contends that the district court abused its discretion in denying his renewed motions to sever, made before the *James* hearing, after the *James* hearing, and at trial after the defense rested and after the charge conference.[19]

---

19. Facchiano's motion for severance after the *James* hearing was spurred by his counsel's recognition that, contrary to counsel's earlier belief, Pepe would not testify at trial. Facchiano's counsel claimed that Pepe would testify at Facchiano's trial if his case were severed and that

failure to sever would deny Facchiano's right to procure testimony in his behalf.

Pepe's counsel proffered Pepe's testimony to the trial court; the court denied the motion, stating that "[i]t is not likely that prejudice will occur" and that "the verdicts will be separately rendered and if the evidence doesn't support a

(These latter two motions to sever were actually motions for a mistrial.) In support of his contention Facchiano cites *Byrd v. Wainwright*, 428 F.2d 1017 (5th Cir.1970), which lists certain factors [20] a court should apply in considering a severance motion based on a co-defendant's potential exculpatory testimony. He also cites *United States v. DeSimone*, 660 F.2d 532 (5th Cir. Unit B 1981), a multiple-defendant drug conspiracy case, which applied the factors set forth in *Byrd*. In *DeSimone*, six defendants sought severance so that they could introduce the purportedly exculpatory testimony of a co-defendant, Butler, who, they said, would testify in their behalf only if he were tried separately. Butler gave an affidavit in which he stated that he would testify that he had not conspired with his co-defendants or they with him and that neither he nor they had possessed marijuana as charged in the indictment. The trial court refused to sever the case, and we affirmed, noting that Butler's affidavit contained no clear indication of "specific and exonerative facts" to which he would have testified. *Id.* at 540. Rather, his affidavit was a bare conclusory assertion that was more self-exonerating than exculpatory of the moving defendants. We also noted that Butler's proffer had not contravened his own penal interests, i.e., it was completely self-serving and thus lacked strong credibility. *Id.* Finally, the savings in time and resources produced by holding a joint trial in such a complex conspiracy case outweighed the possible benefit movants might have derived from Butler's testimony.

In the case at hand, we find that the testimony proffered by the Santos was similar to that proffered by Butler. It consisted almost exclusively of bare exculpatory denials, devoid of any specific exonerative facts. As in *DeSimone*, the testimony was of dubious credibility because it was in no way contrary to the Santos' own interests. Moreover, judicial economy [21] weighed heavily against severance in this complex case.[22] We thus conclude that Facchiano failed to carry his "heavy burden" of showing "compelling prejudice" and that the district court did not abuse its discretion in refusing to sever his case.

### 2. Francis and Paul Santo's Severance Motions

Francis and Paul Santo contend that the district court committed reversible error when it refused to grant their respective motions for a separate trial. Both Santos moved for severance following the *James* hearing. In addition, Francis Santo renewed his motion in the form of a motion for mistrial after the jury was sworn. Both Santos claimed that they needed Pepe's testimony and that Pepe would not testify if he and the Santos were tried together. They made no proffer of what Pepe would say if he took the stand; they

---

verdict of guilty against any defendant, he may be excluded from that guilt by either the jury or the Court." We do not fault this finding for the reasons stated *infra* text at 650–651, and accompanying notes.

20. *Byrd* requires a defendant to demonstrate (1) a bona fide need for the testimony, (2) the substance of the testimony, (3) its exculpatory nature and effect and (4) that the co-defendant will in fact testify if the cases are severed.... If such a showing is forthcoming, the district court must then (1) examine the significance of the testimony in relation to the defendant's theory of defense, (2) assess the extent of prejudice caused by the absence of the testimony, (3) pay close attention to judicial administration and economy and (4) give weight to the timeliness of the motion.

*United States v. DeSimone*, 660 F.2d 532, 539–40 (5th Cir. Unit B 1981) (applying *Byrd*).

21. Facchiano excoriates judicial economy as "the usual hobgoblin" which courts employ to deny severance motions. Although considerations of judicial economy cannot be elevated to the point where they impair a defendant's rights under the Constitution or Fed.R.Crim.P. 14, they are relevant, as *Byrd* and *DeSimone* hold. *See supra* note 20. The trial record, and our analysis, show that judicial economy was not an overriding reason for denying the defendants' severance motions.

22. Terriacca, whose severance motion was granted before trial, pled guilty some time after this trial took place.

simply stated that Pepe's grand jury testimony exculpated them.

This presentation fell far short of the "specific and exonerative facts" requirement of *DeSimone*. The Santos made no concrete showing that Pepe would testify for them if they were tried separately, nor did they proffer what his testimony would be.[23] The district court did not abuse its discretion in denying the severance.[24]

## D. *Francis Santo's Absence from the* James *Hearing*

Francis Santo was seventy-two years old at the time of the indictment. A short while before the court was to convene the *James* hearing, which it had scheduled at the appellants' request, Francis Santo was admitted to the coronary care unit of a Fort Lauderdale hospital with symptoms of a heart attack. His physicians diagnosed his condition as angina pectoris and cardiomyopathy.[25] Santo's counsel thereafter advised the court that Santo's condition made it impossible for him to attend the *James* hearing and that Santo would not waive his right to be present. The court continued the *James* hearing twice[26] and finally took testimony from Santo's treating physicians in an effort to determine when Santo might be well enough to appear in court. The physicians were unable to give the court a definite date, so the court, after concluding that Santo's absence would be involuntary, began the hearing on November 4, 1980.

The court took precautions at the *James* hearing to minimize any prejudice to Santo. Santo's attorney was present throughout the entire hearing, participating fully to protect his client's interests. In addition, the court provided counsel with a daily transcript of the proceedings. Armed with this, counsel conferred nightly with Santo at the hospital. Finally, when Santo was released from the hospital, the court gave him the opportunity to recall for further cross-examination any witness the government had presented.

The only witness put on the stand out of Santo's presence was Herbert Zucker, the government's first witness. Zucker was still on the witness stand, testifying on cross-examination, when Santo returned to court on Monday, November 10, 1980, following his release from the hospital. The court asked Santo's counsel whether, in light of Santo's presence, he had any additional questions to put to Zucker. Counsel replied, "No, I appreciate the opportunity, Your Honor, but I don't believe there would be [additional cross-examination] of this witness after conferring with Mr. Santo." Santo attended the remainder of the *James* hearing, which lasted until November 17.

 Francis Santo now argues that the examination of Zucker during his absence violated his right to be present at all stages of his trial and to confront the wit-

---

**23.** Paul Santo states that in lieu of a severance the trial court should have permitted him to introduce Pepe's grand jury testimony into evidence. Such evidence is generally inadmissible, *see United States v. Carella*, 411 F.2d 729, 732 (2d Cir.), *cert. denied*, 396 U.S. 860, 90 S.Ct. 131, 24 L.Ed.2d 112 (1969), and Santo cites no authority to the contrary.

**24.** Thomas Miglionico claims that the district court abused its discretion in denying his mid-trial severance motion, which we treat as a motion for mistrial, after Gary Bowdach's testimony. We reject his claim.

Because we have held that the denial of appellants' severance motions was proper, we find it unnecessary to assess their initial joinder in the indictment in this case. It is well settled that joinder under Fed.R.Crim.P. 8(b) is proper where an indictment charges multiple defend-

ants with participation in a single conspiracy and also charges some but not all of the defendants with substantive offenses arising out of the conspiracy. *United States v. Phillips*, 664 F.2d 971, 1016 (5th Cir. Unit B 1981) (citing cases).

**25.** Santo had a severe and constricting chest pain caused by deterioration of the middle, muscular layer of the heart. *See* Stedman's Medical Dictionary 68 (3d ed. 1972).

**26.** The *James* hearing was scheduled to commence on October 27, 1980, but was delayed until October 29 because of Santo's hospitalization. The hearing was again rescheduled for November 4 and commenced when Santo remained unavailable. He returned to the courtroom on Monday, November 10, having missed the direct examination of Herbert Zucker and part of Zucker's cross-examination.

nesses against him, accorded by Fed.R. Crim.P. 43 and the sixth amendment. His argument is meritless. A *James* hearing is simply a device for avoiding the risk of inadvertent introduction of hearsay at trial. It is not dispositive on the issue of hearsay, however, because the admissibility of testimony is, ultimately, a trial ruling. Moreover, a *James* hearing is optional; no substantive evidence is taken for trial, and guilt is irrelevant.[27] In *United States v. Roe*, 670 F.2d 956, 962–64 (11th Cir.), *cert. denied*, 459 U.S. 856, 103 S.Ct. 126, 74 L.Ed.2d 109 (1982), this circuit held that the trial court's failure to hold a *James* hearing was not error and that the court was not required to find that a *James* hearing would be impractical before deciding to forego it. *Id.* at 963. In *United States v. Marquardt*, 695 F.2d 1300, 1304 (11th Cir.), *cert. denied*, 460 U.S. 1093, 103 S.Ct. 1793, 76 L.Ed.2d 360 (1983), we explained that a *James* hearing is a prophylactic measure to ensure that the jury does not hear inadmissible evidence but that

> [n]othing in the *James* case suggests that the trial court's failure to hold a *James* hearing constitutes reversible error; the reversible error must occur at trial. Furthermore, the *James* decision does not relieve trial counsel of the obligation to make timely objection to hearsay statements of coconspirators, or to ask the court for appropriate relief when the jury has heard inadmissible hearsay, such as striking testimony, a cautionary instruction, or a mistrial.

We think it clear that Francis Santo had no right under Rule 43 to be present

throughout the taking of testimony at the *James* hearing. Rule 43 requires that, unless a felony defendant absents himself voluntarily or through misconduct, he shall be present at the arraignment, plea, and "every stage of the trial," including impanelment of the jury, the return of the verdict, and sentencing. The Advisory Committee on Criminal Rules, in drafting Rule 43, did not address a *James* hearing, because it is merely an optional, judicially created device, fashioned long after Rule 43's adoption, for the convenience of the parties and the trial court. The first advisory committee note shows clearly that proceedings such as *James* hearings do not fall into the Rule 43 catch-all, "every stage of the trial." That note states: "This principle does not apply to hearings on motions made prior to or after trial." *Id.* (citing *United States v. Lynch*, 132 F.2d 111 (3d Cir.1942)). Rule 43 did not provide Francis Santo a right to be present at the *James* hearing; nor did it require his presence.

Likewise, Santo had no sixth amendment right to be present. The sixth amendment's confrontation clause guarantees that "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with witnesses against him...." To prevail on this issue, Santo must show that the *James* hearing was a stage which implicated the confrontation clause and that the court denied him a chance to confront witnesses. Santo has not cited any other authority for his claim.

The district court, on the other hand, cited *United States v. Gradsky*, 434 F.2d 880 (5th Cir.1970), *cert. denied*, 409 U.S.

---

**27.** Under the *James* standards, the initial admissibility of coconspirator statements will depend upon whether the government can produce *substantial independent evidence* showing that a conspiracy existed between the defendant and the declarant and that the statements were made during the course of and in furtherance of the conspiracy. *James*, 590 F.2d at 581. We hold that the evidence adduced at the *James* hearing was well within this standard, and the district court did not err in admitting the coconspirator statements at trial. Moreover, *James* simply described a preferred evidentiary technique; it did not relieve defense counsel of articulating proper objections to hearsay at trial.

Facchiano claims that there was no substantial evidence put forth at the *James* hearing to establish his membership in the conspiracy, and thus the admission of the coconspirator statements against him was improper. *See* Fed.R.Evid. 801(d)(2)(E); P. Marcus, *supra* note 8, at § 5. The *James* hearing in this case was exhaustive; the testimony of Rafsky and Reifler, which closely tracked the proof adduced at trial, was sufficient to meet our standard of admissibility. *See United States v. Kopituk*, 690 F.2d 1289, 1324 (11th Cir.1982), *cert. denied*, —— U.S. ——, 103 S.Ct. 3542, 77 L.Ed.2d 1391, 461 U.S. 928, 103 S.Ct. 2090, 77 L.Ed.2d 300, 461 U.S. 928, 103 S.Ct. 2089, 77 L.Ed.2d 300 (1983).

894, 93 S.Ct. 203, 34 L.Ed.2d 151 (1972), 401 U.S. 925, 91 S.Ct. 884, 27 L.Ed.2d 828 (1971), and *Yates v. United States,* 418 F.2d 1228 (6th Cir.1969), in ordering the *James* hearing to proceed in Santo's absence. In both of those cases, the court of appeals found no error in the trial court's exclusion of the defendant from a pretrial suppression hearing at which evidence was taken. The *Gradsky* court noted in support of its holding that the defendant was represented by counsel at the hearing and that no court of appeals had extended the sixth amendment right of confrontation to an evidentiary suppression hearing. 434 F.2d at 882. Moreover, the defendant had not shown that he suffered any prejudice as a result of his absence.

We think the district court correctly relied on *Gradsky:* "[t]he right to be present at every stage of trial does not confer upon the defendant the right to be present at every ... [hearing or] conference with the trial judge at which a matter relative to the case is discussed." *United States v. Vasquez,* 732 F.2d 846 at 846, 848 (11th Cir. 1984). *See United States v. Howell,* 514 F.2d 710, 714 (5th Cir.), *cert. denied,* 423 U.S. 914, 96 S.Ct. 220, 46 L.Ed.2d 143 (1975). The *James* hearing in this instance, like the hearings in *Gradsky* and *Yates,* was simply a pretrial evidentiary proceeding. In fact, it was much less important than the hearings in *Gradsky* and *Yates* because it did not bind the court to make any particular evidentiary ruling at trial.

Finally, Santo has alleged not a whit of prejudice caused by his absence. As we have indicated, Santo's counsel was present throughout the hearing and conferred with Santo nightly. In addition, Santo declined the opportunity, on returning to court, to reopen his cross-examination of Zucker. In sum, given the characteristics of a *James* hearing and the facts of this case, we conclude that Francis Santo has not demonstrated any error.

**28.** Zucker was not in the Witness Protection Program but he had recently moved to an ad-

### E. *Discovery and Disclosure*

#### 1. Witness Interviews

The appellants claim they are entitled to a new trial because the prosecutor and the district court hindered or precluded them from interviewing witnesses. At a pretrial status conference, appellants moved the court to require the government to produce its witnesses, who were in the Witness Protection Program or under government control, at a safe, mutually agreeable place so that the defense could interview them before trial. These witnesses included Rafsky, Bowdach, and Zucker.[28] The court denied appellants' motions. The court also denied their requests to require the government to produce the witnesses as they were being assembled in the courthouse before the *James* hearing began. Appellants claim they could have easily interviewed the witnesses at that time.

 It is well established that a defendant is normally entitled, without governmental interference, to access to prospective witnesses. *See, e.g., United States v. Brown,* 555 F.2d 407, 425 (5th Cir.1977), *cert. denied,* 435 U.S. 904, 98 S.Ct. 1448, 55 L.Ed.2d 494 (1978); *United States v. Henao,* 652 F.2d 591 (5th Cir. Unit B 1981). Moreover, the suppression of witnesses by the government violates the due process clause. *E.g., Freeman v. Georgia,* 599 F.2d 65 (5th Cir.1979), *cert. denied,* 444 U.S. 1013, 100 S.Ct. 661, 62 L.Ed.2d 641 (1980) (fourteenth amendment case) (police concealed witness). In most cases in which the court has found a constitutional violation, prosecutors have hidden witnesses or deliberately disobeyed court orders to produce for examination witnesses under governmental control. *See, e.g., Lockett v. Blackburn,* 571 F.2d 309 (5th Cir.), *cert. denied,* 439 U.S. 873, 99 S.Ct. 207, 58 L.Ed.2d 186 (1978); *United States v. Opager,* 589 F.2d 799 (5th Cir.1979).

 This circuit has made it clear that appellants seeking reversal on the basis of

dress unknown to the appellants.

prosecutorially-impaired access to witnesses must allege specific demonstrable prejudice in order to set forth a constitutional claim. *Henao,* 652 F.2d at 593; *United States v. Clemones,* 577 F.2d 1247, 1252 (5th Cir.1978), *cert. denied,* 445 U.S. 927, 100 S.Ct. 1313, 63 L.Ed.2d 759 (1980). Hypothetical or generalized prejudice is insufficient. In *Clemones,* for example, the assistant U.S. Attorney instructed the thirty to thirty-five grand jury witnesses that the proceedings were secret and they could not talk to defense counsel. Defense counsel went to the magistrate and procured an order which stated that all the witnesses could speak freely with the defense. The magistrate directed the U.S. Attorney to serve this order on all the witnesses. *Id.* at 1251. By the time of trial, however, the U.S. Attorney had not yet served the order on the witnesses, and a large number went uninterviewed. The district court denied a defense request for a continuance, and we affirmed the ensuing convictions. We found no constitutional violation because the defendants had failed to demonstrate *particularized* prejudice: "The government erred, but other than general allegations of prejudice the defendants have not shown that they were really harmed .... [Although the defendants] were entitled to be indignant ... they have not demonstrated real, substantive impairment of their right to fair trial." *Id.* at 1252.

 This case does not involve the deliberate violation of a court order or the "hiding out" of a witness. It is clear that the government had no duty, absent a court order, to present its witnesses for interviews; the government's duty was, simply, not to deny access. *See Weatherford v. Bursey,* 429 U.S. 545, 549, 97 S.Ct. 837, 840, 51 L.Ed.2d 30 (1977). Moreover, in their briefs, appellants have failed to

show how they have suffered any real, particularized prejudice. The trial judge denied appellants' motions for pretrial interviews with protected witnesses because Zucker and Rafsky would be available to counsel at the *James* hearing and at trial and because Bowdach would be available at trial, either before or after the government placed him on the stand. The record shows that the trial judge made certain that both Facchiano and Pepe's counsel would have time to conduct private interviews with Rafsky before they cross-examined him. We find no abuse of discretion in the judge's treatment of appellants' requests.

The government's witnesses were in obvious danger. In cases such as this, where protected witnesses are involved, the right of access may be delayed. *See United States v. Walton,* 602 F.2d 1176, 1179–80 (4th Cir.1979); *United States v. Pelton,* 578 F.2d 701, 708 (8th Cir.), *cert. denied,* 439 U.S. 964, 99 S.Ct. 451, 58 L.Ed.2d 422 (1978). As noted, the protected witnesses, here, were available during and after the *James* hearing and before and during trial.[29] In addition, both Rafsky and a nonprotected witness, Vincent Carrano, consented to interviews before testifying on cross-examination. Other witnesses were available, but refused to be interviewed.[30] Nonetheless, the *James* hearing afforded counsel the opportunity to conduct a searching inquiry of the government's case in what was in essence a full blown discovery hearing. Under these circumstances, counsel's need to conduct pretrial interviews diminished considerably.

 Facchiano also claims that the prosecutor denied him access to Edward Vanasco and that the court should have sanctioned his conduct by striking Vanasco's trial testimony.[31] Facchiano's lawyer

---

**29.** Bowdach did not appear at the *James* hearing, but he was available for an interview at trial, where he testified solely concerning the prior crimes of Facchiano. He had testified before a U.S. Senate subcommittee and at a number of other trials involving alleged organized crime figures. Thus defense counsel was likely to be familiar with his testimony.

**30.** *See infra* note 32.

**31.** Vanasco's testimony at trial dealt almost exclusively with the collection efforts in New York. Facchiano also claims that the prosecutor breached a promise to tell Rafsky that Facchiano's counsel wished to interview him. During the time between the promise and the *James* hearing, Rafsky was not working in cooperation

asked Vanasco, who testified at the *James* hearing, for a pretrial interview. Vanasco then sought the prosecutor's advice. The prosecutor told him that he could do as he wished, but that the only reason the defense wanted the interview was to garner impeachment material against him. Facchiano's lawyer learned of the prosecutor's advice and brought the matter to the trial judge. The judge personally addressed Vanasco and informed him that he should view the prosecutor's admonition as the statement of a partisan and that an inter-view with Facchiano's lawyer would be fair, entirely proper, and completely up to him. Vanasco declined to be interviewed.[32] At trial, the court, over Facchiano's objection, permitted Vanasco to testify. We find no error, especially in view of Facchiano's failure to demonstrate any prejudice.[33]

## 2. Jencks Act Issues

The Jencks Act, 18 U.S.C. § 3500 (1982),[34] requires a court, on motion

---

**32.** Edward Vanasco, who spoke with Paul Santo's counsel at the *James* hearing, Lionel Reifler, and a police officer testifying for the government about a meeting between Bowdach and Facchiano, *infra* pp. 669–670, 671, all refused to be interviewed at trial. *See Kines v. Butterworth,* 669 F.2d 6, 9 (1st Cir.1981), *cert. denied,* 456 U.S. 980, 102 S.Ct. 2250, 72 L.Ed.2d 856 (1982) ("[n]o right of a defendant's violated when a potential witness freely chooses not to talk; a witness may of his own free will refuse to be interviewed by either the prosecution or the defense").

**33.** We also find no error in the district court's preclusion of cross-examination as to the home addresses of Bowdach, Rafsky, and Zucker. Bowdach and Rafsky were in the Witness Protection Program; their addresses were protected by law. Zucker, as a government witness and key debtor in a loan sharking case, was in considerable danger. Moreover, Zucker had moved to a new address a few months before the trial, and no one in that community was familiar enough with him to give reputation or character testimony. Finally, the appellants allege no specific prejudice caused by this nondisclosure.

Our holding on this point is controlled by *United States v. Alston,* 460 F.2d 48, 52 (5th Cir.), *cert. denied,* 409 U.S. 871, 93 S.Ct. 200, 34 L.Ed.2d 122 (1972). In *Alston,* an undercover police agent in a narcotics case declined to give his home address on the stand, and the district court sustained an objection to the question. In *Alston,* we interpreted Supreme Court precedent to hold that the defendant normally has a right to examine a witness as to his or her home address but that right does not exist if the exam-

with the government; he was trying to quash the government's subpoena commanding his appearance at trial. The promise was oral, and Facchiano has not shown reliance or prejudice of any kind. Additionally, Facchiano's counsel apparently made no attempt to interview Rafsky individually during the days Rafsky was in court for the *James* hearing, which belies Facchiano's claim that he was prejudiced.

ination is an attempt to "harass, annoy or humiliate [or] ... the physical safety of the witness or his family might be endangered by disclosure." *Id.* The purpose of this right is to enable the defendant to place the witness in his "proper setting." Like the appellant in *Alston,* the appellants in the instant case were fully able to place in their "proper setting" the witnesses for whom no addresses were given.

**34.** The Act states in part:
> **§ 3500. Demands for production of statements and reports of witnesses**
>
> (a) In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.
>
> (b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.
>
> . . . .
>
> (e) The term "statement", as used in subsections (b) ... of this section in relation to any witness called by the United States, means—
>
> (1) a written statement made by said witness and signed or otherwise adopted or approved by him;
>
> (2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or
>
> (3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

of the defendant, to order the government to produce any statement a government witness has made that is in its possession and relates to the subject matter of the witness' testimony. *Id.* at § 3500(b). The purpose of the Jencks Act is twofold: to allow the defendant materials for impeachment and to protect government files from unwarranted disclosure. *See United States v. Smaldone,* 544 F.2d 456, 460 (10th Cir.1976), *cert. denied,* 430 U.S. 967, 97 S.Ct. 1648, 52 L.Ed.2d 358 (1977).[35] Under the Act, the burden is on the defendant to show that the requested materials qualify as "statements" under 18 U.S.C. § 3500(e) and that they relate to the subject matter of the witness' testimony. A trial court's determination whether given materials constitute a Jencks Act statement is subject to reversal only if it is clearly erroneous. *United States v. Medel,* 592 F.2d 1305, 1316 (5th Cir.1979). Even if the trial court refuses to order the production of materials that are later determined to be Jencks Act statements, its refusal will not be considered reversible error if the materials merely duplicate matter already in the defendant's possession.[36]

▬▬▬ This case presents two Jencks Act claims of substance. The first concerns statements Zucker and Rafsky made about their participation in a fraud against the Small Business Administration (SBA). Both before the trial began and after Zucker and Rafsky testified on direct examination, the appellants asked the court to require the government to produce these statements. Appellants argued that they related to the witnesses' testimony as to the solvency of Z & H. Appellants' theory was that Zucker and Rafsky bilked enough money out of the SBA, some $250,000, to alleviate Z & H's cash flow problems; thus,

their testimony that they had to deal with loan sharks to raise cash was of doubtful credibility. The district court concluded that the requested statements would be of "very limited or marginal value" and that appellants had failed to make "an adequate showing that there [was] apt to be any material in [the SBA's investigation files] which would properly fall under [the] Jencks [Act]...."

The district court did not err.[37] The appellants knew that Zucker and Rafsky had pled guilty to the SBA fraud, and they cross-examined the two rigorously at trial. It is well settled that the Jencks Act does not require the production of prior statements that are incidental or collateral to the subject matter of the witness' testimony. *See, e.g., United States v. Mackey,* 571 F.2d 376, 389 (7th Cir.1978); *United States v. Pacelli,* 491 F.2d 1108, 1118 (2d Cir.), *cert. denied,* 419 U.S. 826, 95 S.Ct. 43, 42 L.Ed.2d 49 (1974). Moreover, the appellants, through discovery, had received Z & H's bank statements and cancelled checks; consequently, they could have established Z & H's cash flow from this source rather than the SBA files.

Facchiano argues, in addition, that the district court erred in not ordering the release of "all of Bowdach's statements concerning the Mafia, organized crime, and loansharking," including "any statements of any nature, description, that are in the hands of the FBI at any office [and those in] any U.S. Attorney's office." The purpose of Facchiano's request apparently was to obtain impeachment evidence.

▬▬▬ Bowdach was at one time an active participant in an organized crime family. He later turned government witness and testified in a number of criminal

---

35. *See also* Annot., 1 A.L.R.Fed. 252 (1969).

36. *See, e.g., United States v. Rivero,* 554 F.2d 213 (5th Cir.1977).

37. Nor do we think the district court erred by denying appellants' Jencks Act motions for Horowitz' and Heller's statements in the SBA files. Horowitz and Heller did not testify in this case; the Jencks Act therefore did not apply.

*Medel,* 592 F.2d at 1316 n. 12. Appellants claim, however, that Horowitz' and Heller's hearsay declarations were admitted into evidence through the testimony of Zucker and Rafsky, and thus Horowitz and Heller became "witnesses" for purposes of the Jencks Act. Even if we agreed, the statements of Horowitz and Heller concerning the SBA fraud were not producible under Jencks for the reasons stated in the text.

trials and before the Permanent Subcommittee on Investigations of the U.S. Senate Committee on Governmental Affairs.[38] Bowdach's testimony here, however, dealt only with Facchiano's membership in organized crime and his prior debt collection practices. *See infra* pp. 669–670. The prosecutor produced Bowdach's grand jury testimony and the single interview report that related to his knowledge of Facchiano's debt collection practices. Additionally, Facchiano had access to Bowdach's testimony before the Senate subcommittee.

Facchiano's request for *all* of Bowdach's prior statements was patently overbroad. Granting Facchiano's request would have forced the government to find and produce all statements [39] Bowdach had ever made about organized crime and loan sharking. The plain words of the Jencks Act cannot be stretched this far.[40] *See Medel,* 592 F.2d at 1316–17; *Mackey,* 571 F.2d at 389; *Pacelli,* 491 F.2d at 1119–20.

### III.

#### A. *Sufficiency of the Evidence*

■ Appellants each claim that the evidence was insufficient as a matter of law to support the jury verdicts of guilty and that the district court erred in denying their respective motions for acquittal. In reviewing their claims, we must ask whether, viewing the evidence and its natural inferences in a light most favorable to the government, a rational trier of fact could have found all elements of the crimes proved beyond a reasonable doubt. *See United States v. Bell,* 678 F.2d 547, 549 (5th Cir. Unit B 1982) (en banc) ("not necessary that the evidence exclude every reasonable hypothesis of innocence"), *aff'd on other grounds,* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). *United States v. Thevis,* 665 F.2d 616, 648 (11th Cir.), *cert. denied,* 456 U.S. 1008, 102 S.Ct. 2300, 73 L.Ed.2d 1303 (1982).

#### 1. Sufficiency of the Evidence Against Facchiano

Facchiano claims that the evidence was insufficient to prove that he engaged in a RICO conspiracy with his coindictees, that he committed a substantive RICO violation, and that he used extortionate means to

---

**38.** The committee was investigating organized criminal activities in South Florida and the U.S. Penitentiary in Atlanta, Georgia.

**39.** *See supra* note 34.

**40.** Facchiano brings two other Jencks Act issues on appeal. First, he claims that the trial court did not determine which materials were producible under the Act but rather permitted the government to make this determination. Our reading of the record shows this claim to be patently meritless.

Second, Facchiano alleges that the district court erred when it did not order the production he requested under the Act of *all* prior promises of consideration made to Bowdach or received by him from the government, no matter what the case or time. Facchiano claims that this violated both the Jencks Act and the rule of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). There was no Jencks Act violation because the materials sought by Facchiano's carte blanche request in no way "related" to the testimony Bowdach gave at trial. Indeed, had the trial court granted the request the U.S. Attorney would have had to conduct a nationwide search involving numerous governmental agencies. We cannot say that failure to order this disclosure was erroneous. The jury was fully aware of any consideration Bowdach received in the instant case and that Bowdach was a habitual felon who frequently traded his testimony for leniency in his own recurring criminal prosecutions. If by chance, however, error occurred, it was clearly harmless. *Goldberg v. United States,* 425 U.S. 94, 111 n. 21, 96 S.Ct. 1338, 1348 n. 21, 47 L.Ed.2d 603 (1976) (Jencks Act harmless error standard).

Nor can we conclude that the denial of this material violated *Brady.* *Brady* held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is *material* either to guilt or punishment...." *Brady,* 373 U.S. at 87, 83 S.Ct. at 1196–97 (emphasis added). In this circuit we apply a strict standard of materiality. *See United States v. Judon,* 567 F.2d 1289, 1293 (5th Cir.1978). The information alleged as *Brady* evidence was at best tangentially related to guilt or punishment and thus was not "material." *See also United States v. Agurs,* 427 U.S. 97, 112–13, 96 S.Ct. 2392, 2401–02, 49 L.Ed.2d 342 (1976).

collect the first Facchiano/Terriacca loan.[41] Facchiano initially contends that the evidence, at best, showed two separate loan sharking conspiracies, not just one as alleged in the indictment. The first conspiracy, he submits, was headed by Francis Santo and included Pepe, Paul Santo, and Miglionico. The second conspiracy involved Terriacca and Facchiano. (Facchiano claims his inclusion in the second conspiracy was an example of guilt by association.) He claims that these two groups happened to lend to the same debtors but that the loans were made at different times, for different amounts, and on different terms. This proof, according to Facchiano, produced a fatal variance in violation of the rule that "a material variance between the indictment and the government's evidence is created by the government's proof of multiple conspiracies under an indictment alleging a single conspiracy." *United States v. Sutherland,* 656 F.2d 1181, 1189 (5th Cir.1981) (citing *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)), *cert. denied,* 455 U.S. 949, 102 S.Ct. 1451, 71 L.Ed.2d 663 (1982). A conviction obtained under such circumstances must be set aside unless the defendant's substantial rights were not affected. *Id.*

To prove a single RICO conspiracy the government must show that the conspirators agreed to participate, directly or indirectly, in the affairs of an enterprise through a pattern of racketeering activity or through collection of an unlawful debt. 18 U.S.C. § 1962(d). *See United States v. Sutherland,* 656 F.2d 1181, 1189–93 (5th Cir.1981), *cert. denied,* 455 U.S. 949, 102 S.Ct. 1451, 71 L.Ed.2d 663 (1982); *United States v. Elliott,* 571 F.2d 880, 902–03 (5th Cir.), *cert. denied,* 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978). *See also* P. Marcus, Prosecution and Defense of Criminal Conspiracy Cases § 4.02(2)(d) (1983 Supp.). A RICO conspiracy differs from an ordinary conspiracy in two respects: it need not embrace an overt act,[42] and it is broader and may encompass a greater variety of conduct.[43]

In proving a RICO conspiracy, the government does not have to establish that each conspirator explicitly agreed with every other conspirator to commit the substantive RICO crime described in the indictment, or knew his fellow conspirators, or was aware of all the details of the conspiracy. *See United States v. Cagnina,* 697 F.2d 915, 922 (11th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 175, 78 L.Ed.2d 157 (1983). That each conspirator may have contemplated participating in different and

**41.** Extortionate collection of the first Terriacca loan was not alleged as a substantive violation itself but was a predicate act of racketeering activity under count two. *See supra* p. 642, and accompanying notes.

**42.** *See United States v. Coia,* 719 F.2d 1120, 1123 (11th Cir.1983).

**43.** *See United States v. Elliott,* 571 F.2d 880, 903 (5th Cir.), *cert. denied,* 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978). In that case we held that, because a RICO enterprise is broader than a traditional conspiracy, section 1962(d) authorizes prosecution of a broader range of criminal activity than the traditional common law conspiracy. *E.g., Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). *Accord United States v. Lee Stoller Enterprises,* 652 F.2d 1313 (7th Cir.) (en banc), *cert. denied,* 454 U.S. 1082, 102 S.Ct. 636, 70 L.Ed.2d 615 (1981). We refined *Elliott* in later cases, but the *Elliott* holding remains in force. *See, e.g., United States v. Bright,* 630 F.2d 804, 834 n. 52 (5th Cir.1980) (limiting *Elliott* to cases not involving conspiracies with definite and discernible outlines).

Facchiano relies heavily on *United States v. Sutherland,* 656 F.2d 1181 (5th Cir.1981), *cert. denied,* 455 U.S. 991, 102 S.Ct. 1617, 71 L.Ed.2d 852, 455 U.S. 949, 102 S.Ct. 1451, 71 L.Ed.2d 663 (1982). *Sutherland* held that multiple conspiracies may not be alleged in a single section 1962(d) count merely because they involve the same enterprise. As *Sutherland* interpreted *Elliott,* the activities of a conspiracy are unified not through a common enterprise but through "agreement on an overall objective." 656 F.2d at 1192–93. We pretermit any lengthy discussion of *Sutherland* because we hold, *infra* p. 660, that the conspiracy alleged in this case stemmed from a unified agreement on an overall objective. *See Sutherland,* 656 F.2d at 1189 n. 5. Thus, the instant conspiracy fell within traditional concepts of conspiracy discussed in *Kotteakos, supra. Accord United States v. Carter,* 721 F.2d 1514, 1531 (11th Cir.1984). *See generally* Marcus, *supra* note 27.

unrelated crimes is irrelevant. *United States v. Lee Stoller Enterprises, Inc.*, 652 F.2d 1313, 1319 (7th Cir.) (en banc), *cert. denied*, 454 U.S. 1082, 102 S.Ct. 636, 70 L.Ed.2d 615 (1981). Finally, there is no requirement that each defendant must have agreed to commit two predicate acts of racketeering activity. *United States v. Carter*, 721 F.2d 1514, 1528–31 (11th Cir. 1984). The government need only prove that each defendant conspired to commit the substantive RICO offense and was aware that others had done likewise. *Sutherland*, 656 F.2d at 1193, 1194. *See Elliott*, 571 F.2d at 903.

■ Applying these standards, and viewing the evidence in the light most favorable to the government, we conclude that the evidence was sufficient to support a finding that one conspiracy existed and that Facchiano participated in it. The jurors heard testimony that the two Facchiano/Terriacca loans Pepe obtained from Terriacca were from Terriacca *and* Facchiano. Pepe described Facchiano as the head of the largest "Mafia shylocking operation" in South Florida. Pepe solicited all of the loans for the partners and helped all of the creditors collect on them. The jurors

also knew that Facchiano had traveled to New York to "help straighten out the Rafsky loans." Facchiano and Paul Santo worked in tandem at the Essex House meeting. At the end of the meeting, Facchiano concluded that "he could not control the situation and would have to leave it in Paul [Santo's] and Eddie [Vanasco's] hands...." The jurors heard Vanasco testify that Facchiano thought the meeting went well; the partners' race horses were winning, and it looked like everyone would get paid.

■ From this evidence, a reasonable trier of fact could have concluded that one common agreement with a unified objective existed in this case.[44] The evidence clearly showed that two groups of loan sharks, one headed by Francis Santo, the other by Facchiano, conspired together to victimize Z & H and its partners. Both loan sharking groups used the same loan solicitor and repayment conduit, Pepe. They engaged in joint collection efforts, such as the Essex House meeting, and together settled on a plan to obtain satisfaction through the winnings of the race horses. Certainly, this was an "agreement on

---

**44.** The finding of a RICO conspiracy, of course, does not require that two predicate acts of racketeering activity actually occurred; nor need there be collection of unlawful debt. There need only exist an agreement to perform these acts. *United States v. Phillips*, 664 F.2d at 1038.

We also hold that the evidence was more than ample to support Facchiano's conviction under count five, the Travel Act count. The jurors heard evidence that "someone was coming to Florida" to "straighten out the Rafsky loans" and Facchiano, who lived in Florida was at the Essex House doing just that. Facchiano also stated after the meeting that he had recently spoken with the trainer of the racehorses in Florida (at Calder Race Track) concerning the horses' prospects.

There was venue to try count five in the Southern District of Florida. *See infra* note 56. For purposes of the Travel Act, venue lies in any district in which the travel occurred, including the district in which it originated. *See United States v. Blitstein*, 626 F.2d 774, 782–83 (10th Cir.1980), *cert. denied*, 449 U.S. 1102, 101 S.Ct. 898, 66 L.Ed.2d 828 (1981); *United States v. Polizzi*, 500 F.2d 856 (9th Cir.1974), *cert. denied*, 419 U.S. 1120, 95 S.Ct. 802 (1975); *United States v. Guinn*, 454 F.2d 29, 33 (5th Cir.), *cert. denied*,

407 U.S. 911, 92 S.Ct. 2437, 32 L.Ed.2d 685 (1972). Venue need only be established by a preponderance of the evidence, which may be met by "circumstantial evidence [which] as a whole reasonably supports the inference that the crime was committed in the trial district." *United States v. Wuagneux*, 683 F.2d 1343, 1357 (11th Cir.1982), *cert. denied*, — U.S. —, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983); *Martino*, 648 F.2d at 400.

We also find no merit in Facchiano's contention that venue was lacking for the government's inclusion of act of racketeering (k), *supra* note 12, as a collection of unlawful debt in count two. *See supra* note 13. The venue to which Facchiano was entitled was that guaranteed by Fed.R.Crim.P. 18; the trial was in the district where he committed his crime. The crime at issue here was not that alleged in act (k), as incorporated into the indictment as a collection of unlawful debt. Instead, the crime was participation in the affairs of an interstate enterprise through a pattern of racketeering activity or a collection of unlawful debt. Facchiano committed that crime in the same district where he later faced trial, the Southern District of Florida.

an overall objective," *Sutherland,* 656 F.2d at 1193–94, and satisfied our standard for proof of one conspiracy.

■■■■■ Facchiano next contends that the evidence was insufficient to prove him guilty of the count two substantive RICO offense. To convict Facchiano of a substantive RICO violation in this case, the government had to prove beyond a reasonable doubt that he associated with a loan sharking enterprise[45] having effect on interstate commerce and that he participated in the conduct of its affairs through a pattern of racketeering activity *or* through collection of unlawful debt. *See Phillips,* 664 F.2d at 1011 (citing cases).[46] A pattern of racketeering activity consists of two predicate acts of racketeering activity,[47] found by the jury beyond a reasonable doubt.[48] The government, however, was required to prove only one collection of unlawful debt.[49] The indictment alleged that Facchiano engaged in several racketeering acts: extending the first Facchiano/Terriacca loan in 1973, collecting that loan through extortion, traveling in interstate commerce to New York City for the Essex House meeting for unlawful purposes, and using extortionate means to attempt to collect money at the Essex House. *See supra* note 12. The indictment also alleged that Facchiano engaged in collection of unlawful debt on several occasions: extortionately collecting the first loan, traveling to the Essex House to collect several loans, and using extortionate means of collection at the Essex House meeting. *See supra* note 13.

We conclude, viewing the evidence and its inferences in a light most favorable to the government, that the evidence was sufficient to support the jury's verdict. The jury heard testimony from Rafsky, Reifler, and Zucker that clearly inculpated Facchiano as a participant in the acts of the enterprise. The evidence was sufficient for a reasonable trier of fact to conclude that Facchiano committed at least two predicate acts of racketeering activity attributed to him in the indictment[50] or collected an unlawful debt. In fact, the evidence was sufficient to support *each* alleged act of racketeering and collection of unlawful debt.

■■■■ Facchiano contends, however, that, irrespective of the strength of the evidence, two of the predicate acts listed in count two of the indictment were identical, and the jury could have relied on them, thus grounding his conviction on only one complete "act." He submits that predicate act (k) and count five of the indictment, which also was listed as predicate act (i), arose out of the same transaction and are identical. Predicate act (k) alleged that Facchiano used extortionate means to collect an extension of credit at the Essex House meeting in New York City, as that crime is defined by 18 U.S.C. § 894.[51] Count five of

---

**45.** The court's jury instructions defining "enterprise" tracked the statute, *see supra* note 10, but the instructions also stated that the indictment "alleges that the enterprise consisted of a group of individuals associated in fact for the purpose of making extortionate extensions of credit, collecting of extensions of credit by extortionate means, and collecting unlawful debts."

**46.** The indictment alleged that the defendants participated in the affairs of an enterprise through a pattern of racketeering activity *and* through collection of unlawful debt. The statute reads in the disjunctive, however, and the jury was so instructed.

**47.** *See supra* note 6.

**48.** RICO does not criminalize engaging in a pattern of racketeering or collecting unlawful debt, but rather criminalizes participation in the affairs of an enterprise through those means.

**49.** *See supra* note 7. The applicable RICO provision defines "unlawful debt" as a debt where the interest rate is twice that defined as usurious under state law. Fla.Stat.Ann. § 687.02 (1984) provides a general 18% per annum maximum legal interest rate. The terms of the loans in this case were much greater than 36%; the parties do not contest this fact.

**50.** Facchiano was charged with acts of racketeering activity listed as (a), (b), and (k) in the indictment, *supra* note 12. The indictment also listed as a predicate act the Travel Act violation in count five.

**51.** 18 U.S.C. § 894 states:
**Collection of extensions of credit by extortionate means**

the indictment alleged that Facchiano violated the Travel Act, 18 U.S.C. § 1952,[52] by traveling in interstate commerce with the intent to carry out the unlawful act of extortionate collection and then by actually promoting, managing, or carrying out the act. As the Senate Report on the Travel Act bill stated:

> [T]o come within the provisions of the bill some activity in furtherance of a racketeering enterprise, subsequent to the performance of the travel, must take place ... *accordingly the gravamen of the offense will be travel and a further overt act to aid the enterprise.*

S.Rep. No. 644, 87th Cong., 1st Sess. 2 (1961) (emphasis added), *cited in United States v. Jones*, 642 F.2d 909, 912 n. 4 (5th Cir.1981).

> (a) Whoever knowingly participates in any way, or conspires to do so, in the use of any extortionate means
> (1) to collect or attempt to collect any extension of credit, or
> (2) to punish any person for the nonrepayment thereof,
> shall be fined not more than $10,000 or imprisoned not more than 20 years, or both.
> (b) In any prosecution under this section, for the purpose of showing an implicit threat as a means of collection, evidence may be introduced tending to show that one or more extensions of credit by the creditor were, to the knowledge of the person against whom the implicit threat was alleged to have been made, collected or attempted to be collected by extortionate means or that the nonrepayment thereof was punished by extortionate means.
> (c) In any prosecution under this section, if evidence has been introduced tending to show the existence, at the time the extension of credit in question was made, of the circumstances described in section 892(b)(1) or the circumstances described in section 892(b)(2), and direct evidence of the actual belief of the debtor as to the creditor's collection practices is not available, then for the purpose of showing that words or other means of communication, shown to have been employed as a means of collection, in fact carried an express or implicit threat, the court may in its discretion allow evidence to be introduced tending to show the reputation of the defendant in any community of which the person against whom the alleged threat was made was a member at the time of the collection or attempt at collection.

**52.** 18 U.S.C. § 1952 states:

Predicate act (k) and count five are not identical; Facchiano's claim thus fails as a matter of law. Section 894 (act k) and section 1952 (count five) each penalize separate conduct and require separate elements; the latter penalizes interstate travel for criminal purposes while the former penalizes extortionate means of collection. The RICO definition section, listing predicate acts of racketeering activity, states that violations of sections 894 and 1952 will each constitute separate acts of racketeering.[53]

We have previously encountered the type of claim Facchiano presents, most recently in *Phillips*, 664 F.2d at 1039. *Phillips* relied heavily on *United States v. Starnes*, 644 F.2d 673, 677–78 (7th Cir.1981), which is on all fours with the instant case.[54] The

**Interstate and foreign travel or transportation in aid of racketeering enterprises**
(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—
(1) distribute the proceeds of any unlawful activity; or
(2) commit any crime of violence to further any unlawful activity; or
(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,
and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3) shall be fined not more than $10,000 or imprisoned for not more than five years, or both.
(b) As used in this section "unlawful activity" means (1) any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics or controlled substances (as defined in section 102(6) of the Controlled Substances Act), or prostitution offenses in violation of the laws of the State in which they are committed or of the United States, or (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States.
(c) Investigations of violations under this section involving liquor shall be conducted under the supervision of the Secretary of the Treasury.

**53.** *See supra* note 6.

**54.** In *Phillips* we held that the two crimes of possession of marijuana with intent to distribute and distribution of marijuana could not consti-

*Starnes* defendant committed an arson after traveling in interstate commerce with the intent to do so. The court of appeals held that even though the interstate travel violation and the arson may have been for the same purpose and incidental to each other, each act was a separate act of racketeering activity under RICO. *See also United States v. Martino,* 648 F.2d 367, 402–03 (5th Cir.1981) (arson and mail fraud arising from same burning), *cert. denied,* 456 U.S. 949, 102 S.Ct. 2020, 72 L.Ed.2d 474, 456 U.S. 943, 102 S.Ct. 2007, 72 L.Ed.2d 465, 456 U.S. 943, 102 S.Ct. 2006, 72 L.Ed.2d 465 (1982); *United States v. Colacurio,* 659 F.2d 684, 688 n. 4 (5th Cir.1981) (multiple briberies), *cert. denied,* 455 U.S. 1002, 102 S.Ct. 1635, 71 L.Ed.2d 869 (1982). Contrary to Facchiano's contention, the government did not list a single criminal act twice to do double duty and form a pattern of racketeering activity. Act (k) and count five alleged "predicate crimes related to the affairs of the enterprise, thus meeting the requirement for proving a pattern of racketeering activity." *Martino,* 648 F.2d at 403; *accord Phillips,* 664 F.2d at 1011 (RICO requires "two separate crimes").

■ Facchiano also contends that the evidence was insufficient to show that he was involved in the first Facchiano/Terriacca loan, either in extortionately extending the money, as alleged in predicate act (a), or in using extortionate means to collect it, as alleged in predicate act (b). The first

loan was for $10,000 at two percent interest per week. It resulted from a meeting between Pepe, Terriacca, and Zucker. Terriacca threatened the partners at that meeting, stating that they would repay the money he or "his people" lent or face injury. The partners were threatened a number of times after they borrowed the money. At one point Pepe urged them to pay off the loan or face the wrath of "Terry's organization" which Pepe said was controlled by "Chink." The loan was clearly extortionate when extended, and extortionate means were successfully used to collect it. Additionally, the jury heard evidence indicating that the acts of extending and collecting the first Facchiano/Terriacca loan were in furtherance of a common enterprise that was headed by Facchiano and invoked Facchiano's name to induce payment. We are unable to conclude that a reasonable trier of fact, viewing this evidence and its inferences in a light most favorable to the government, could not have found that Facchiano, acting through his agents Terriacca and Pepe, committed this extortionate extension and collection as alleged in predicate acts (a) and (b).

■ Finally, Facchiano claims that count two must fall because one of the acts listed therein as a collection of unlawful debt was time-barred. The collection of unlawful debt prong of RICO has no statute of limitations written into it and must therefore borrow the general five-year limitation found in 18 U.S.C. § 3282 (1982) [55]

---

tute two separate predicate RICO acts because upon successful distribution the possession crime merged and both crimes then became a single violation of 21 U.S.C. § 841(a) (1982). *Id.* at 1039 (citing *United States v. Hernandez,* 591 F.2d 1019 (5th Cir.1979) (en banc)). The facts of the instant case are dissimilar to *Phillips.* Here, the two crimes alleged as predicate acts do not become one. As Facchiano concedes in his brief, "we do not contend that in this case, as in *Phillips,* there were no two separate acts." The facts of *Starnes* are quite similar to this case, and that opinion, relied on by *Phillips,* is persuasive.

**55.** *See supra* note 13. Facchiano claims that acts which constitute collection of unlawful debt are subject to a five-year statute of limita-

tions, unlike those acts which establish a pattern of racketeering activity. We agree. 18 U.S.C. § 1961(5) (1982) defines "pattern of racketeering activity" as two or more predicate acts, at least one of which was committed during the general federal five-year statute of limitations period. 18 U.S.C. § 3282 (1982). The first, oldest, predicate act, however, may be beyond the five-year period so long as it was committed within ten years of the second, recent, act. *Id.* at § 1961(5). Thus a pattern of racketeering could be established with the first act almost fifteen years old. *But cf. id.* (one act must be committed after effective date of RICO).

This is not true when the government seeks to impose RICO liability by proving a collection of unlawful debt, however. A plain reading of the RICO statute shows that the ten-year statute of

which directs that "no person shall be prosecuted, tried or punished for any offense ... unless the indictment is found ... within five years next after such offense shall have been committed."

One of the acts alleged to show Facchiano's collection of unlawful debt was act (b), the collection of the first Facchiano/Terriacca loan in late 1973. Facchiano claims that his conviction on count two must fall because this act was over five years old at the time of the indictment and was time-barred under section 3282. According to Facchiano, the jury's general verdict on count two must be set aside because the jury may have based its verdict on this time-barred conduct.

 At the close of all the evidence Facchiano moved for a judgment of acquittal on the ground that act (b) was time-barred; he also moved that act (b) be struck from the indictment and excluded from the court's charge to the jury. The court denied these motions, but instructed the jury that it could not consider any allegations of unlawful debt collection unless it found that the acts of collection occurred after June 21, 1974, the limitations period date. This date was also the proper limitations date for all of the other counts. Thus, if the jury followed the court's instruction it would not have considered act (b) at all, because it occurred in 1973. The jury had copies of the court's jury charge with it during deliberations.

Facchiano claims that the jury was unable to follow the charge and that the court's failure to strike collection of unlawful debt act (b) constituted reversible error because the jury could have based his count two guilt on that invalid alternative. The district court's failure to strike act (b) was error, but we think any prejudice was prevented by the court's clear oral and written instructions concerning the proper date. We think the jury was capable of following the instruction that the government had to prove that the collection of unlawful debt occurred subsequent to June 21, 1974. This instruction was stated twice in plain English and also set forth in the written instructions that the jury had during its deliberations. Facchiano's contention to the contrary is pure conjecture, based on the unfounded notion that the jury was incapable of following the simplest of instructions.

Moreover, Facchiano's conviction on count five, which count two incorporated by reference as an act of collection, belies Facchiano's claim that the jury could have based count two liability on act (b) alone. By establishing the count five offense, the Travel Act violation, the government proved the collection of unlawful debt alleged in count two. This is all that was required for count two liability given that the other RICO elements in count two were established. In sum, Facchiano cannot claim that his count two conviction should be set aside because it could have been based on an invalid alternative ground.[56]

limitations extension found in section 1961(5) only applies to a pattern of racketeering activity.

**56.** Facchiano also contends that the evidence was insufficient to establish venue in the Southern District of Florida for the prosecution of the count two substantive RICO offense. His contention is frivolous. The count two offense had a substantial nexus with the Southern District of Florida. The "enterprise" element of the offense, loan sharking, appears to have originated in that district, and the enterprise carried out much of its activity there. Moreover, Facchiano completed his commission of the offense in the Southern District of Florida by commencing his Travel Act violation (the trip to the Essex House in New York City) in South Florida. The venue for a Travel Act violation may be properly laid

in any district in which the offense was begun, continued, or completed, *United States v. Davis,* 666 F.2d at 200; *United States v. Blitstein,* 626 F.2d 774, 782 (10th Cir.1980), *cert. denied,* 449 U.S. 1102, 101 S.Ct. 898, 66 L.Ed.2d 828 (1981); *United States v. Guinn,* 454 F.2d 29, 33 (5th Cir.), *cert. denied,* 407 U.S. 911, 92 S.Ct. 2437, 32 L.Ed.2d 685 (1972), and, here, the jury found that that violation began in the Southern District of Florida. *See supra* note 44.

Even if we were to hold that it was not sufficient for venue purposes that the threshold "enterprise" element of Facchiano's substantive RICO offense took place in the Southern District of Florida, we would still reject appellant's venue argument, for it is clear that the final element of the RICO offense did occur there.

### 2. Sufficiency of the Evidence Against Miglionico

 The jury acquitted Miglionico of count one, the RICO conspiracy, but found him guilty of count two, the substantive RICO violation, and count seven, use of extortionate means to collect credit from Sanford Rafsky. The indictment alleged that Miglionico engaged in acts of racketeering when he used extortionate means (threats) to collect credit from Rafsky throughout 1974 and in October 1975, when he assaulted Rafsky at the racetrack. The indictment listed the same acts in support of the collection of unlawful debt.

Miglionico's assertion that the evidence was insufficient to prove that these acts took place, and therefore the verdicts on counts two and seven must be set aside, is without merit. The evidence showed that Miglionico was a knowing participant in the enterprise, placed as an employee at Z & H by Francis Santo in 1974 to "watch" Santo's investment. Miglionico himself stated as much to Rafsky, saying that he was "out to protect Jigger's interests at all costs" and "if Jigger didn't get paid [he] would have to collect for Jigger." The record is replete with evidence concerning Miglionico's threats to the partners throughout 1974, especially those made to Sanford Rafsky. The record is also clear that Miglionico assaulted Rafsky at the racetrack in October 1975, because of the debt Rafsky owed to Francis Santo. There was sufficient evidence to permit the jury to find that Miglionico was an active participant in the enterprise, committed two predicate acts of racketeering, or collected unlawful debt,[57] and used extortionate means to collect credit as alleged in count seven.

### 3. Sufficiency of the Evidence Against Francis Santo

The jury found Francis Santo guilty on all counts lodged against him: counts one, two, three, five, and six. He claims that the evidence was insufficient to support any of these verdicts. For ease of analysis we discuss count five first.

 Francis Santo was convicted under count five as an aider and abettor of Facchiano's Travel Act violation when Facchiano went to New York City to participate in the Essex House meeting.[58] The government's theory was that Francis Santo caused Facchiano to go to New York to coerce payment from Rafsky.

 A culpable aider and abettor need not perform the substantive offense,[59] need not fully know of its details,[60] and need not even be present.[61] To obtain a conviction for aiding and abetting, the government must show that the defendant associated himself with the crime, participated in it as something he wished to bring about, and sought by his actions to make it succeed. *United States v. Bryant,* 671 F.2d 450, 454 (11th Cir.1982); *United States v. Schwartz,* 666 F.2d 461, 463 (11th Cir.1982).

The government failed to sustain its burden of proof on count five. The evidence showed that when Paul Santo arranged the Essex House meeting with Rafsky's associates, Kops and Reifler, he told them that

---

**57.** *See supra* notes 12 and 13.

**58.** The federal statute, 18 U.S.C. § 2 (1982), making liable as a principal one who aids and abets a crime does not establish a separate crime of "aiding and abetting." *See United States v. Pearson,* 667 F.2d 12 (5th Cir. Unit B 1982). That statute states:

**§ 2. Principals**
(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

The jury was properly instructed under this statute.

**59.** *United States v. Staten,* 581 F.2d 878, 886 (D.C.Cir.1978).

**60.** *United States v. Sanborn,* 563 F.2d 488, 491 (1st Cir.1977).

**61.** *United States v. Molina,* 581 F.2d 56, 61 (2d Cir.1978).

"someone [apparently not Francis Santo] was coming in from Florida to help straighten out the Rafsky loans" and that this person "was involved with money with Rafsky in some way." When Reifler and Kops entered the Essex House, they met the person to whom Santo had referred, Facchiano. Kops had known Facchiano as "Chink." Facchiano immediately began complaining about the money owed him from the second Facchiano/Terriacca loan. Paul Santo and Edward Vanasco arrived. Vanasco stated that "Jigger [Francis Santo] was unable to make it." The conversation soon became threatening, and Paul Santo repeated Francis Santo's previous demands for the racehorses. The meeting then broke up.

■ The government provided no evidence that Francis Santo aided Facchiano's Travel Act violation or that he caused Facchiano to engage in it. No testimony was offered that Francis Santo suggested that Facchiano travel to New York, ever spoke to him, or assisted him in any way. Viewing the evidence in a light most favorable to the government, we reverse Santo's count five conviction.[62]

The government did introduce sufficient proof to support Francis Santo's conviction under count three for extortionate extensions of credit in connection with the third Santo loan.[63] Besides testimony of the partners about the loan, the government called a fabric supplier who testified that the day the loan was made the partners attempted to give him $16,000 in cash "from the money we ha[ve] just gotten from Jigger."[64]

Francis Santo claims that count one must fail because the evidence did not support that he conspired to participate in an interstate loan sharking enterprise. Santo claims that he operated by himself, lending money as an investment and not through any agreement with Facchiano, Miglionico, Pepe, or Paul Santo. The RICO statute does not limit the term "enterprise"; it simply defines it to include "any . . . group of individuals associated in fact." 18 U.S.C. § 1961(4) (1982). As we stated in *Elliott*, an enterprise is any association which "however loose and informal, furnishes a vehicle for the commission of two or more predicate crimes." 571 F.2d at 898. *Accord United States v. Diecidue*, 603 F.2d 535, 545 (5th Cir.1979), *cert. denied*, 446 U.S. 912, 100 S.Ct. 1842, 64 L.Ed.2d 266, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781 (1980). An enterprise need not have any distinct, formal structure. *Cagnina*, 697 F.2d at 921.

■ As we discussed *supra* in Part IV.A., the evidence clearly showed an association of individuals affiliated for the purpose of victimizing Z & H and its partners through loan sharking. That Francis Santo was not closely associated with some members of the enterprise is irrelevant. *See Martino*, 648 F.2d at 394. It is also irrelevant that Francis Santo may not have been a member of a traditional organized crime "family." RICO's reach does not respect such boundaries. The evidence showed that Francis Santo provided three of the five loans to the partners and enforced them through threats and assaults in close consort with Pepe, Paul Santo, and Miglionico. Francis Santo was connected with Facchiano through Pepe, their joint solicitor and collection agent, and through the unified collection efforts such as the Essex House meeting and the plan to extract repayment from race horse winnings. The proof was abundant that Santo conspired to participate in the affairs of an enterprise through a pattern of racketeer-

---

**62.** *See supra* note 44.

**63.** The indictment alleged that this loan was made on June 25, 1974, within the limitations period by four days. The proof at trial supported this allegation.

**64.** We also find the testimony of Rafsky and Carrano sufficient to support Francis Santo's conviction under count six, charging use of extortionate means to collect extensions of credit on the day before the racetrack assault. The uncontroverted testimony showed that Francis Santo pushed Rafsky, spat at him and threatened to break his legs on the day in question.

ing activity or the collection of unlawful debt.[65] *See Carter,* 721 F.2d at 1530–31.

 Francis Santo also questions the sufficiency of the evidence to support his conviction on count two, the substantive RICO count. Count two alleged ten predicate acts of racketeering against Francis Santo and six collections of unlawful debt. The section of count two listing racketeering activity incorporated by reference counts three (third Santo loan), five (aiding and abetting Facchiano's Travel Act violation), six (use of extortionate means to collect credit on the day before the racetrack assault), and seven (aiding and abetting Miglionico on the day of the racetrack assault).[66] The other acts of racketeering covered Francis Santo's conduct in extending extortionate credit and attempting to collect extortionate credit on the first Santo loan; extending extortionate credit and attempting to collect extortionate credit on the second Santo loan; sending Pepe to New York to coerce Rafsky; making threatening telephone calls to Rafsky in New York; and aiding and abetting Paul Santo's and Facchiano's attempts to collect extortionate loans at the Essex House. The six collections of unlawful debt incorporated the conduct alleged in counts five and seven. They also covered Francis Santo's conduct in attempting to collect his first and second loans, including making threatening phone calls to Rafsky in New York and aiding and abetting Facchiano's and Paul Santo's attempted collection at the Essex House.

With the exception of the act of racketeering and collection of unlawful debt arising out of the count five Travel Act violation, the evidence was more than sufficient to find beyond a reasonable doubt that Francis Santo committed all the acts alleged. He was a central figure in the conspiracy; the jury heard abundant evidence concerning his extortionate extensions of credit [67] and his threats of violence if the unlawful debt went unpaid. He made these threats both in Florida and New York, in person and by telephone, and through Pepe, Miglionico, and Paul Santo. The jury also heard how some of these threats actually succeeded in coercing payment.

 As we held *supra,* however, the government failed to prove that Francis Santo engaged in the conduct described in count five, and since count two incorporated count five, as both a predicate act of racketeering and an act of collection of unlawful debt, the government also failed to prove these count two acts. Thus, Francis Santo's best argument in his attack on count two would be that the jury could have relied on the count five conduct as one of the two required racketeering acts or as the required collection of unlawful debt. *See, e.g., United States v. Tarnopol,* 561 F.2d 466, 475 (3d Cir.1977) (multiple object conspiracy conviction reversed where no proof to one of alleged objects).

We are not convinced that this possibility requires the reversal of count two, how-

---

**65.** Francis Santo's claim that the enterprise did not affect interstate commerce is frivolous. Paul Santo threatened Rafsky repeatedly in New York, seeking repayment for his father's loans made in Florida. He even accepted a $5,000 payment in New York. Francis Santo made, and apparently caused Pepe to make, threatening phone calls from Miami to Rafsky in New York.

In *Perez v. United States,* 402 U.S. 146, 154–56, 91 S.Ct. 1357, 1361–62, 28 L.Ed.2d 686 (1971), the Court found that, under the Consumer Credit Protection Act, extortionate credit transactions, though purely intrastate in nature, had an inherent effect on interstate commerce. *Perez* was not a RICO case; we find no need to apply it here.

**66.** Count seven charged Francis Santo with causing, aiding, or abetting Miglionico's use of extortionate means to collect credit on the day Miglionico assaulted Rafsky, as we have noted, *supra* note 12. Santo was not tried under this count, and the jury did not adjudicate his guilt or innocence thereunder. The evidence showed that Francis Santo induced, aided, and abetted Miglionico's use of extortionate means to collect credit at the racetrack. Miglionico had told Rafsky previously that he would look out for Francis Santo's investment at all costs. At the racetrack Miglionico said to Rafsky, "Come with me, Jigger wants to see you." When Rafsky refused to follow, Miglionico attacked him.

**67.** *See supra* note 49.

ever. The jury convicted Francis Santo of counts three and six. Counts three and six were incorporated by reference into count two as predicate acts of racketeering. Counts three and six operated like special verdicts; by finding guilt on those counts the jury also found that two predicate acts listed in count two had been shown. *Accord United States v. Peacock*, 654 F.2d 339, 348 (5th Cir.1981) (separate arson counts incorporated by reference as predicate acts into substantive RICO count), *vacated in part on other grounds*, 686 F.2d 356 (5th Cir. Unit B 1982).[68] Accordingly, the government proved at least two predicate acts of racketeering beyond a reasonable doubt. This is all the government had to prove to establish a RICO pattern of racketeering and substantive RICO liability. *Elliott*, 571 F.2d at 899 n. 23 (defendant must commit two acts of racketeering and "the two or more predicate crimes must be related to the affairs of the enterprise but need not be related to each other").

### 4. Sufficiency of the Evidence Against Paul Santo

 The racketeering acts and unlawful debt collections alleged against Paul Santo dealt with his continual threats against Rafsky in New York, his successful collection there of $7,500 from Rafsky, and his participation in the Essex House meeting, where he also aided and abetted Facchiano's collection efforts. Santo claims that the record fails to show that he loaned the partners any money and thus that he committed any RICO violations.[69] He admits that he dealt with Rafsky, but only innocently in an attempt to collect on his father's investments.

As we noted *supra*, a member of a RICO enterprise need not participate in all of the enterprise's activities or even have knowl-

edge of them; he is criminally responsible if he is aware of the basic structure and purpose of the enterprise. The record shows that, after Rafsky moved to New York, Paul Santo threatened him and his family, threatened and assaulted Rafsky's representatives, and promised to injure the partners' race horses. In addition, Paul Santo aided Facchiano's efforts at the Essex House meeting and did most of the talking there. The evidence was more than sufficient to show that Paul Santo acted as a collection agent for the appellants' loan sharking enterprise.

### 5. Sufficiency of the Evidence Against Pepe

 The racketeering and collection of debt activities alleged against Pepe covered his conduct in soliciting and facilitating the loans, in acting as a payment conduit, and in threatening the partners. Pepe claims he was an employee of the partners, was "on their side," and thus could not have been convicted under counts one, two, and three. The record belies this claim. Pepe was an eager and greedy middleman. He introduced the partners to the lenders; obtained loans for the partners, deducting commissions for himself; relayed weekly payments to the lenders; and repeated and amplified the lenders' threats. At one meeting with the partners Pepe stated that he could no longer hold off the "serious consequences" of nonpayment. Both the partners and the lenders used Pepe for their own ends, but the record clearly shows that he allied himself with, and participated in, the enterprise. His conviction under count three is specifically supported by the evidence which established that he solicited and negotiated the third Santo loan for $20,000 at three percent interest

---

**68.** *See also United States v. Dansker*, 537 F.2d 40 (3d Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977) (distinguished in *Peacock* ).

**69.** Paul Santo also claims that the evidence was insufficient to support his conviction under count five for aiding and abetting or causing

Facchiano's Travel Act violation. This is patently without merit. The record shows that Paul Santo and Facchiano cooperated in arranging the Essex House meeting, conducted it in teamwork fashion, and reviewed the meeting's developments at some length afterward. *See also* the venue discussion, *supra* notes 44 and 56.

per week, from which he deducted a $2,000 commission for himself.

### B. *Other Evidentiary Rulings*

#### 1. Testimony of Gary Bowdach

The appellants claim that the testimony of Gary Bowdach was inadmissible under Fed.R.Evid. 403 and 404(b) and the Extortionate Credit Transactions Statute,[70] 18 U.S.C. § 894(c), and was so prejudicial and inflammatory that it constituted reversible error.[71] Gary Bowdach had been a mid-level hoodlum in a number of organized crime rings. As such, he was familiar with the identities and practices of many organized crime figures. The government finally closed in on Bowdach, and he was indicted. In exchange for leniency, Bowdach became a star government witness. Prior to the trial in this case, he had testified in a number of criminal cases and before the Permanent Subcommittee on Investigations of the U.S. Senate Committee on Governmental Affairs.

When he testified against the appellants, Bowdach was on parole in the government's protected witness program. The prosecutor called Bowdach to the stand to testify about Facchiano's previous criminal activity, contending that Bowdach's testimony was admissible for the purpose of establishing Facchiano's motive and ability to perpetrate the crimes charged. *See* Fed. R.Evid. 404(b). The prosecutor also contended that Bowdach's testimony was admissible under the Extortionate Credit Transactions Statute[72] which authorizes the introduction of evidence concerning a creditor's reputation for collection practices when direct testimony of the debtor is una-

vailable. A creditor's reputation for collection may be crucial in extortionate lending cases because loan sharks normally cannot collect unless they instill fear in the borrower, and fear is a natural component of extortion.

The prosecutor's direct examination of Bowdach was short. Bowdach testified that he and Facchiano had been members of the "Genovese organized crime family" operating out of New York City and that Facchiano and Terriacca ran a "shylock operation." Bowdach then testified that in 1974 he borrowed money from one of Facchiano's shylocks, and Facchiano summoned him to a meeting at a restaurant when he refused to repay the loan. At the meeting Facchiano took Bowdach outside and threatened him. While Facchiano was delivering the threats, Bowdach noticed two police officers, whom he recognized, observing them from some distance. He and Facchiano then split up and left. The court sustained a defense objection to the prosecutor's question whether Bowdach knew Facchiano's reputation in the community of Miami, Florida. The court also sustained an objection to a question inquiring of Facchiano's position within the "Genovese crime family." At no time during his direct examination did the prosecutor, or Bowdach, use the terms "mafia," "mob," or *"la cosa nostra."* The prosecutor ended his questioning of Bowdach after eliciting from Bowdach a description of his most recent felonies and the fact that the government had promised to inform the parole authorities of his cooperation in its case against Facchiano.

Facchiano's cross-examination of Bowdach was extensive. His lawyer first es-

---

**70.** 18 U.S.C. § 892(c), a portion of the Extortionate Credit Transactions Statute, provides in pertinent part:

> if evidence has been introduced tending to show [the debt is unenforceable under civil judicial processes or the interest exceeded 45 percent per annum], and direct evidence of the actual belief of the debtor as to the creditor's collection practices is not available, then for the purpose of showing the understanding of the debtor and the creditor at the time the extension of credit was made, the court may in its discretion allow evidence to be intro-

> duced tending to show the reputation as to collection practices of the creditor in any community of which the debtor was a member at the time of the extension.

**71.** Bowdach's testimony was limited to Facchiano's case, but all appellants claim that "the odor of Bowdach's testimony [was] so overpowering that it permeated the entire trial, and therefore reversal is required."

**72.** *See supra* note 70.

tablished that Bowdach was a vicious murderer, a turncoat, and a liar. Then he developed the theme that his own client, Facchiano, was a "mafia chieftan." Referring to Facchiano with these words, counsel got Bowdach to say, for the first time, that the "Genovese crime family" was actually the "mafia" and that Facchiano was a mafia "captain." Counsel also inquired into affairs of the Genovese and Gambino "mafia families."[73]

The district court, in overruling Facchiano's objection when Bowdach first took the stand, held that Bowdach's testimony would be received pursuant to the Extortionate Credit Transactions Statute, because it tended to show the reputation for collection practices of the creditor, Facchiano. The court also ruled that the contested evidence was probative of the RICO charges and tended to show an association between Facchiano and his coconspirators. The court gave the jury appropriate limiting instructions immediately before Bowdach testified, and it repeated those cautionary instructions in its final charge. The gist of these instructions was that Bowdach's testimony constituted "similar acts" evidence, applicable *only* to Facchiano, which, standing alone, could not convict him of the crime charged. The jury was told, however, that, if it found by "clear and conclusive" evidence that Facchiano had committed these extrinsic acts, it could consider the acts as bearing on his intent, state of mind, lack of mistake or accident, and willfulness. Finally, the court cautioned that the jury could consider none of the evidence unless it first found, based on *other* evidence in the case, that Facchiano was guilty of the acts charged in the indictment beyond a reasonable doubt.

■ Facchiano contends that admission of Bowdach's testimony inflamed the jury and resulted in a conviction based on guilt by association. We disagree. Because we hold that Bowdach's testimony of Facchiano's previous involvement in a shylock operation was admissible as extrinsic acts evidence under Fed.R.Evid. 404(b), we need not comment upon its admissibility under the Extortionate Credit Transactions Statute.

Rule 404(b) provides that evidence of other "crimes, wrongs, or acts ... may ... be admissible for other purposes [than to prove character] such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." If evidence of other crimes or wrongs is offered for one of these purposes, "[t]he determination must be made whether the danger of undue prejudice outweighs the probative value of the evidence, in view of the availability of other means of proof and other factors appropriate for making decisions of this kind under Rule 403(a)." Fed.R.Evid. 404(b) advisory committee note. *See United States v. Astling*, 733 F.2d 1446, 1456–57 (11th Cir.1984).

Under Rule 404(b) the admissibility of extrinsic acts evidence is determined by a two-prong test: first, the proffered testimony "must be relevant to an issue other than the defendant's character. Second, the probative value of the evidence must not be substantially outweighed by its undue prejudice, and the evidence must be otherwise admissible under rule 403." *Id.* (citing *United States v. Beechum*, 582 F.2d 898 (5th Cir.1978) (en banc)), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979).

Here, Bowdach's testimony was relevant to Facchiano's intent, not his character. It showed that Facchiano committed prior acts sufficiently similar to one or more crimes charged in the indictment to permit the inference that he intended to commit such crime.[74] *Astling*, 733 F.2d at 1457.

---

**73.** The government probed this opening somewhat on redirect.

**74.** Although the district court charged the jury that it had to find the extrinsic criminal acts by "clear and conclusive" evidence, that was not

required. As we pointed out in *Astling*, 733 F.2d at 1457:

> That the defendant committed the extrinsic offense need not be proven beyond a reasonable doubt or even by clear and convincing evidence. Under Fed.R.Evid. 104(b), such a

The prosecution's proof that Facchiano committed the extrinsic crimes of extortionate extensions of credit and use of extortionate means to collect credit was clear. Bowdach's testimony on this score was uncontradicted and was bolstered by the testimony of a police officer who stated that he had observed Bowdach and Facchiano outside the restaurant at the time Bowdach said he met with Facchiano. Moreover, the extrinsic offense evidence Bowdach produced disclosed conduct almost identical to that charged against Facchiano in the indictment: the intent elements in the extrinsic criminal conduct were identical to those required to convict Facchiano on counts one, two, and five. The extrinsic conduct Bowdach described, including Facchiano's membership in a "crime family," was also probative as to identity, preparation, and plan.

■ Turning to *Beechum*'s second prong, we hold that the probative value of Bowdach's testimony was not substantially outweighed by its undue prejudice. We realize that testimony concerning "the mafia" and "*la cosa nostra*" can be most inflammatory, especially when a defendant has an Italian surname. However, much of the prejudice from "mafia" testimony was caused by Facchiano's own trial tactics. A thorough reading of the record shows that the prejudice was not undue, nor did it substantially outweigh the probative value of Bowdach's testimony. The probative value of the evidence was high; intent was a crucial element because Facchiano's theory was that no threats were used to coerce payment at the Essex House. Bowdach's testimony on direct examination was "not of a heinous nature, likely to incite the jury to an irrational decision," *United States v.*

*McMahon*, 592 F.2d 871, 876 (5th Cir.), *cert. denied*, 442 U.S. 921, 99 S.Ct. 2847, 61 L.Ed.2d 289 (1979); nor was it cumulative or confusing to the jury. *United States v. Tunsil*, 672 F.2d 879, 881 (11th Cir.), *cert. denied*, 459 U.S. 850, 103 S.Ct. 110, 74 L.Ed.2d 98 (1982). The trial judge clearly acted within his discretion in admitting the evidence.[75]

### 2. Testimony Concerning the "Burly Men" from Las Vegas

■ The district court admitted testimony which showed that the partners had gone to Las Vegas in early 1973, obtained a fraudulent line of $35,000 casino credit at the Aladdin Hotel, and then cashed in their chips and capitalized Z & H with the money. The court also admitted hearsay testimony bearing on some of these points: Zucker testified that Pepe said he had mollified the "burly men" by invoking the name of "Chink" and that Pepe stated he later gave "Chink" the partners' $5,000 check for interceding with the casino.

The court ruled that all of this evidence was relevant and not unduly prejudicial. Later in the trial, however, the court struck the testimony connecting Facchiano to the settlement of the gambling debt and admonished the jury to disregard that testimony only as it related to Facchiano. The court decided that the "burly men" incident had not occurred "during the course and in furtherance of the conspiracy," *see* Fed.R. Evid. 801(d)(2)(e), and that proof of it constituted hearsay as to Facchiano. In its final charge to the jury, the court further instructed the jury that the defendants were on trial only for the conduct alleged in the indictment.

preliminary fact could be decided by the judge against the proponent of the extrinsic evidence only if a jury could not reasonably find from the evidence that the defendant committed the extrinsic offense.
(citing *Beechum*, 582 F.2d at 913).

**75.** Miglionico moved for a severance after Bowdach testified, claiming that the prejudice had a "spillover" effect. He asserts that the trial court's failure to grant a severance at that point

was reversible error. We disagree. As we noted, Miglionico must show "compelling prejudice" caused by the trial court's failure to sever. The trial court made it abundantly clear that Bowdach's testimony went only to Facchiano. Moreover, Bowdach's testimony was a short episode in a long trial, and it never implicated Miglionico. The jury acquitted Miglionico on count one, showing that it could assess the proof applicable to him.

Facchiano claims that the challenged testimony was unduly prejudicial and that the court's instructions striking it were insufficient to remove the prejudice from the case. We disagree. We need not decide whether the testimony was inadmissible as coconspirator hearsay; the court struck it and the jury was firmly and adequately instructed to disregard it. (Had the government offered it as such, the testimony could have been admitted not for its truth, but to show why the partners later resorted to Pepe for money, and to show Pepe's and Facchiano's connection with each other, or Pepe's and Facchiano's ability to undertake shady financial dealings.) There is no reason to presume that the jurors disregarded the cautionary instructions given by the district court when it struck the testimony. *See Lakeside v. Oregon,* 435 U.S. 333, 340 & n. 11, 98 S.Ct. 1091, 1095 & n. 11, 55 L.Ed.2d 319 (1978). The evidence concerning the Las Vegas trip was clearly relevant and admissible even though the hearsay implicating Facchiano was stricken. The testimony showed the genesis of Z & H, its shaky finances, and the partners' desperation. The testimony also established Pepe as a person who could arrange deals on the edges of the underworld. We find no abuse of discretion here.[76]

### 3. Miglionico's Motion to Reopen Evidence

After all parties had rested, Miglionico moved to reopen the evidence to present the testimony of one witness, Donald Kovac. Miglionico asserts that the trial court's failure to reopen the evidence or, alternatively, to grant him a new trial requires reversal. We disagree.

Miglionico subpoenaed Kovac but he failed to appear, apparently because of a medical problem. When Miglionico's counsel proffered Kovac's testimony to the court, he explained that Kovac was Miglionico's landlord and would testify that Miglionico's rent was always unpaid because Z & H never paid Miglionico his wages. Miglionico's theory was that he beat Sanford Rafsky at the racetrack because of a personal debt, not because of money Rafsky owed Francis Santo. The court considered the testimony, stated that it was not "crucial," and denied the motion to reopen evidence. It also later denied Miglionico's motion for a new trial which asserted the same ground.

**76.** All appellants claim that we should reverse their convictions because the district court failed to grant a mistrial when the government elicited from Rafsky at trial that he was presently in "fear[ ] for my life." At the time the appellants moved for a mistrial, the court said it would grant the mistrial unless the government could prove a continuing reasonable fear on the part of Rafsky for which the defendants were responsible. The court later denied their motions for mistrial, apparently satisfied that the government had met the court's requirements. The court also denied motions to strike the testimony.

The court erred in failing to strike the testimony, as it was irrelevant. The fear of the victim in a loan shark or extortion case is often crucial, but the issue here dealt with Rafsky's *present* fear, at trial. The error, however, was harmless. The testimony concerning Rafsky's fear was cumulative of inferences the jurors no doubt drew from the abundant, and properly admitted, evidence which showed threats and assaults. Any reasonable juror would have concluded that conduct of the appellants placed Rafsky in continuing fear.

We also find no merit in Francis Santo's contention that his convictions should be reversed because the government called him a "bookmaker" in its opening statement to the jury and elicited the same label from Zucker on direct examination. The court twice instructed the jury to "disregard the reference to bookmaking" and not "permit it to have any impact." Additionally, the court cautioned Zucker not to use the term. Finally, in its final instructions, the court cautioned the jurors that the appellants were on trial only for the precise crimes charged. Given the overwhelming evidence against Francis Santo, showing him to be a shylock and extortionist, we cannot agree that the "bookmaker" label, which was disposed of properly by the district court, resulted in a fundamentally unfair trial.

Additionally, we find no error in the prosecutor's closing argument that Miglionico's theory of defense, that he had nothing to do with loan sharking, was a fanciful "Magic Kingdom defense." Finally, Miglionico's claim that the trial court showed bias against his counsel during closing argument is totally unsupported by the record.

We discern no abuse of discretion. Kovac's testimony could not have served the purpose Miglionico sought. Only through inadmissible hearsay could Kovac have testified that Miglionico's employer did not pay him regularly. Moreover, all sides had rested and a number of witnesses had been released due to the Christmas holidays; they would have been difficult to recall had rebuttal been required. Finally, the proffered testimony was cumulative of other evidence, including the testimony of Rafsky and Zucker, that Rafsky and Z & H had failed to pay Miglionico on time or at all.

### IV.

#### A. *The Indictment*

The appellants contend that the indictment was faulty because it was unclear and duplicitous. Specifically, they object to count two, which presented alternate grounds of substantive RICO liability in one count. They assert that the pattern of racketeering activity prong and the collection of unlawful debt prong should have been stated in separate counts because the jury was unable to separate properly the elements of each. We disagree. The indictment fairly tracked the RICO statute, 18 U.S.C. § 1962(c), which imposes liability in two ways. Although RICO prosecutions involving collections of unlawful debt are rare, we have found two cases in which the indictment was written in a similar manner. *See United States v. Morelli*, 643 F.2d 402, 403–04 (6th Cir.), *cert. denied*, 453 U.S. 912, 101 S.Ct. 3143, 69 L.Ed.2d 994 (1981); *United States v. Altese*, 542 F.2d 104, 105 (2d Cir.1976), *cert. denied*, 429 U.S. 1039, 97 S.Ct. 736, 50 L.Ed.2d 750 (1977). We find no error in stating both prongs of RICO liability in one count.

The appellants argue, in a similar vein, that a section 1962(c) RICO count may not allege the same act as both a predicate act of racketeering and as a collection of unlawful debt. Appellants contend that this overlapping use of predicate offenses in count two "makes doubtful any prospect of instructing the jury satisfactorily." They

argue that "[o]ne RICO prong is enough for any judge or jury." We agree that stating the RICO prongs in separate counts could simplify matters. We are unable, however, to conclude that use of alternative grounds of RICO liability and overlapping acts in one count contravened the statute or any of the appellants' rights. They do not allege any specific injury or surprise at trial caused by the allegedly confusing indictment. *See United States v. Chilcote*, 724 F.2d 1498, 1505 (11th Cir. 1984) (practical rather than technical considerations govern validity of an indictment). The indictment, tracking the RICO statute, was complex, but, clearly, it was not incomprehensible.

#### B. *Jury Instructions*

Appellants seek reversal for a number of alleged errors in the jury instructions. Their first complaint arises from the district court's jury instruction on the "collection of an unlawful debt" element of the RICO counts, one and two. The RICO statute provides liability for participation in the affairs of an enterprise through "collection of unlawful debt." The district court's charge on this element, however, was identical to a portion of its charge concerning extortionate collection of credit. 18 U.S.C. § 894 (counts six and seven). The disputed instruction, which tracked a section of the Extortionate Credit Transactions Statute, *id.* at § 894(a), stated that:

> The government is required to prove .... First: [t]hat ... the defendant knowingly participated in the use of extortionate means to collect *or attempt to collect* from Sanford Rafsky an extension of credit, *or punish Sanford Rafsky for nonpayment thereof.*

(emphasis added). Appellants contend that RICO's plain language only proscribes "collection of unlawful debt," not attempted collection. Thus, they argue, the count one and two instructions were faulty. According to appellants, the district court should have instructed the jury that a RICO "collection of an unlawful debt" requires the jury to find successful collection rather

than merely an act of collecting or inducing payment.

In their briefs, appellants cite the meaning of "collection" as found in lay and legal dictionaries. Appellants neither cite, nor have we found, any cases or parts of the legislative history of RICO which support their position. To the contrary, Congress stated in the public law that enacted RICO that RICO's purpose was to "seek eradication of organized crime in the United States by strengthening legal tools ... establishing new penal prohibitions, and by providing enhanced sanctions and new remedies." Organized Crime Control Act of 1970, Statement of Findings and Purpose, Pub.L. 91–452, 1970 U.S.Code Cong. & Ad.News (84 Stat.) 1073. The same public law ordered that "the provisions of [RICO] shall be liberally construed to effectuate its remedial purpose." *Id.* at § 904.

It does not take a very liberal construction of RICO to reject appellant's argument. Appellants would have us apply RICO to collection of unlawful debt only when cash actually exchanged hands.[77] To accept appellants' definition of collection would mean that a loan shark who killed his victim before the victim could hand over the money could not be charged under the RICO collection of unlawful debt prong. This runs against common sense and the remedial nature of RICO. Absent any legislative history showing otherwise we cannot believe Congress had such a result in mind. Congress defined "to collect" in the Extortionate Credit Transactions Statute as "induce[ing] in any way any person to make repayment." 18 U.S.C. § 891(5) (1982). We think this is a proper definition of the term "collection" in RICO as well.[78]

77. Appellants claim that their argument, here, also goes against the pattern of racketeering prong of RICO liability, because predicate act of racketeering (k), implicating Facchiano and both Santos, alleged the use of extortionate means to collect *or attempt to collect. See supra* note 12. This attempt element, according to appellants, was not proscribed by RICO. Appellants are mistaken in this contention, however, because RICO, 18 U.S.C. § 1961(1), lists as possible predicate acts of racketeering violations of the Extortionate Credit Transactions Statute, and that statute defines "collections" as any acts "induce[ing] in any way any person to make repayment thereof."

78. On a related issue, the appellants assert as error that the trial court failed to provide the jury with the legal definition of "attempt" in its instructions on counts one, two, five, and six. Contrary to the requirements of Fed.R.Crim.P. 30, no defense counsel filed a written request for this charge. Moreover, no defense counsel objected to the charge at the conclusion of the evidence or earlier, at the charge conference. After the charge was read to the jury and the jury had retired to consider its verdict, Facchiano's counsel objected to the court's failure to define attempt in counts five and six. Nothing was mentioned about counts one and two, and Facchiano never stated how "attempt" should have been defined in the instructions. He did not request the court to recall the jury and instruct it on the word "attempt." His objection on this issue covered only counts five and six and came in a string of objections he was creating for the record.

Facchiano claims that his counsel preserved the objection properly, at least as to counts five

and six. He cites *Delancey v. Motichek Towing Serv., Inc.,* 427 F.2d 897, 900 (5th Cir.1970), for the proposition that an objection to the court's failure to give a jury instruction may be properly preserved even though the instruction is not requested prior to the charge. *Motichek* stands for no such proposition. The appellant there complied *in toto* with Fed.R.Civ.P. 51 and apprised the court of his requested instructions prior to the charge. *Id.* at 899, 901. The *Motichek* court stressed that "[t]his court has consistently held that the specifications of errors dealing with the giving of or failure to give instructions will not be considered unless the party objects in the manner provided by rule." *Id.* at 900. Since Fed.R.Civ.P. 51 is an analytical twin of Fed.R.Crim.P. 30, *see* advisory committee note to Rule 30, we find *Motichek* convincing.

Facchiano's counsel failed to follow Rule 30 on his objections concerning counts five and six; he never filed a written request for an instruction or advised the court orally of a requested instruction. Only after the jury had retired did he object to the court's failure to give an instruction covering "attempt." No objections concerning counts one and two were made at all. We will only reverse a jury instruction for plain error if, viewing the court's charge as a whole, it was so clearly erroneous as to result in a substantial likelihood of a grave miscarriage of justice. *See infra* p. 675. Appellants were far from meeting this standard. None were charged with an attempt offense. The appellants certainly were not injured in their inability to argue the definition of "attempt" to the jury in their closing arguments; no counsel requested such an instruction so they must not have thought about it. We hold that the court

 The appellants next complain that the instructions covering the element of collection in counts one, two, six, and seven permitted the jury to find the collection element based upon the punishment of Sanford Rafsky for nonpayment, even though these counts of the indictment stated nothing about punishment. *See supra* instruction, p. 674. This phrase concerning punishment was, indeed, omitted from the relevant counts of the indictment. The issue appellants raise was never preserved, however, by proper objection pursuant to Fed.R.Crim.P. 30, which states in part, "[n]o party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds for his objection." [79] Accordingly, our review of this issue is limited to correcting plain error.

Jury instructions will not be reversed for plain error unless "the charge, considered as a whole, is so clearly erroneous as to result in a likelihood of a grave miscarriage of justice," or the error "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Thevis*, 665 F.2d 616, 645 (5th Cir. Unit B 1982) (citing *United States v. Varkonyi*, 645 F.2d 453, 459 (5th Cir.1981)), *cert. denied*, 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61, 456 U.S. 1008, 102 S.Ct. 2300, 73 L.Ed.2d 1303 (1982). In our judgment the charge did not constitute plain error under this standard. The extraneous punishment instruction came from the Extortionate Credit Transactions Statute, upon which some of the counts were based. The instruction obviously did not "surprise" the defense; defense counsel neither noticed it nor objected. It could not have prejudiced the appellants through surprise because proof of punishment was at the heart of the government's case; the "punishment" of Sanford Rafsky permeated the entire trial. The indictment amply showed that the grand jury considered that the crimes charged encompassed threats and punishment. Plainly, the challenged jury instruction was not at variance or inconsistent with the grand jury's understanding of the crime. *See United States v. Cahalane*, 560 F.2d 601, 606 (3d Cir.1977), *cert. denied*, 434 U.S. 1045, 98 S.Ct. 890, 54 L.Ed.2d 796 (1978).

Most importantly, the phrase concerning the punishment of Sanford Rafsky was merely cumulative of the words "collect" or "attempt to collect." The record reveals no instances of punishment of Rafsky, including the racetrack assault, which were not accompanied by collections or attempts to collect. Thus the jury could not have based liability on punishment alone, and we see no harm in the court's inclusion of references to punishment in its charge.

 Appellants bring one other issue of substance concerning the jury instructions. They claim that the district court erred in declining to instruct the jury that participation in the enterprise's affairs had to be knowing and willful. Without these elements of mens rea and scienter, appellants claim, RICO would become a strict liability measure. We disagree.

In *Diecidue*, 603 F.2d at 548, we rejected this contention. A plain reading of the statute indicates that RICO does not contain any separate mens rea or scienter ele-

thoroughly explained the elements of each count. It is well settled that a court need not define terms that are not unduly technical or ambiguous or that are within the common understanding of the jury. *See United States v. Johnson*, 575 F.2d 1347, 1357–58 (5th Cir.1978), *cert. denied*, 440 U.S. 907, 99 S.Ct. 1213, 59 L.Ed.2d 454 (1979) ("organizer, supervisor, or position of management"); *United States v. Roby*, 499 F.2d 151 (10th Cir.1974) ("forged and falsely made securities"); *Evans v. United States*, 349 F.2d 653, 658–59 (5th Cir.1965) ("proprietary interest"); *Popeko v. United States*, 294

F.2d 168 (5th Cir.1961), *cert. denied*, 374 U.S. 835, 83 S.Ct. 1883, 10 L.Ed.2d 1056 (1963) ("securities"); *Guon v. United States*, 285 F.2d 140 (8th Cir.1960) ("aiding and abetting").

79. "The obvious purpose of this provision is to inform the trial judge of possible errors so that he may have an opportunity to correct them." 8A J. Moore, Moore's Federal Practice ¶ 30.04, at 30–21 (2d ed. 1984). A general carte blanche objection to the court's jury charge will not provide the specificity required by Rule 30.

ments beyond those encompassed in its predicate acts. *Accord United States v. Romano,* 684 F.2d 1057, 1065 (2d Cir.), *cert. denied,* 459 U.S. 1016, 103 S.Ct. 376, 74 L.Ed.2d 509, 459 U.S. 1016, 103 S.Ct. 375, 74 L.Ed.2d 509 (1982); *United States v. Scotto,* 641 F.2d 47, 56 (2d Cir.1980), *cert. denied,* 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981); *United States v. Boylan,* 620 F.2d 359, 361–62 (2d Cir.), *cert. denied,* 449 U.S. 833, 101 S.Ct. 103, 66 L.Ed.2d 38 (1980). In defining the elements of the RICO offenses here, the court tracked the language of Devitt & Blackmar, Federal Jury Practice and Instructions, § 56.20 (Supp.1983), and the Fifth Circuit Pattern Jury Instructions (Crim.), No. 37 (1979). In count one the court stressed that the jury must find "[t]hat the defendant, with the knowledge of the conspiracy, willfully became a member of the conspiracy by agreeing to participate." In count two the court charged that the jury had to find beyond a reasonable doubt "[t]hat the defendant was engaged in a pattern of racketeering activity ... by knowingly and willfully committing at least two acts of racketeering activity" or "knowingly or willfully collect[ing] an unlawful debt." The court additionally defined the terms "knowingly" and "willfully" and instructed that these mental states were required under the Travel Act and the extortionate credit counts which were alleged as predicate acts. The jury instructions in this case concerning state of mind were almost identical to those approved in *Diecidue, supra.* We hold that the court properly instructed the jury as to the mental state required for a RICO conviction. The bases for the verdicts were far from strict liability.[80]

### C. *Alleged Perjury of a Government Witness*

Facchiano and both Santos moved for a new trial because they claimed that the government failed to disclose favorable treatment to its witness, Lionel Reifler, in exchange for his testimony and then acquiesced in his perjurious testimony regarding those promises. Facchiano claims that this evidence, discovered shortly after trial, constituted a violation of the pretrial discovery orders and of the rules set forth in *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), and *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and was "newly discovered" evidence entitling him to a new trial under Fed.R.Crim.P. 33. Facchiano claims that at trial the government and Reifler failed to disclose a "deal" with federal prosecutors in the Northern District of Illinois where Reifler pled guilty and received concurrent sentences, and later a reduction in sentence, for his cooperation in another federal case in Illinois and certain federal cases in Florida. The district court took extensive briefing on the issue but did not hold an evidentiary hearing. It denied the motion in a lengthy memorandum and order. Facchiano and both Santos assert this denial as error.

When the investigation of this case began, Reifler was informed by federal prosecutors in Miami that his cooperation would be made known to judicial or parole authorities. On July 15, 1976, Reifler, pursuant to a plea agreement, changed from innocent to guilty two pleas he had entered in the Northern District of Illinois for wire fraud and interstate transportation of stolen property. The prosecutor had agreed to recommend concurrent sentences and to keep the court informed of Reifler's cooperation with federal authorities. Sentencing was then delayed, rescheduled, and delayed again. In the interim, a prosecutor from the Miami Organized Crime Strike Force sent Reifler's lawyer a letter for use in the sentencing which described Reifler's cooperation in the instant case.

---

**80.** We reject as utterly without merit Facchiano's contention that, based upon Young Lawyer's Section, Bar Assn. of District of Columbia, *Criminal Jury Instructions,* No. 1.06B (3d ed. 1978), the trial court should have instructed the jury that it could consider Reifler's *James* hearing testimony, which was brought out at trial to impeach Reifler, as substantive evidence exculpating Facchiano.

On December 15, 1976, the district court sentenced Reifler to two concurrent four-year terms, pursuant to the plea agreement. At the sentencing the court stated that Reifler could move for a reduction in sentence if he could show substantial further cooperation with federal prosecutors. Reifler moved for a reduction in sentence on April 8, 1977. While that motion was pending, the prosecutor in the instant case sent a letter to the sentencing judge in Illinois, outlining Reifler's cooperation in *United States v. Anthony Accetturo*, another criminal case in the Southern District of Florida. The letter did not mention the instant case.

At a sentence reduction hearing on February 14, 1978, the Illinois prosecutor recommended that Reifler's sentence be reduced to eighteen months. The prosecutor's recommendation was based on Reifler's cooperation with federal authorities in Chicago and with federal prosecutors working on *Accetturo*.

As part of the discovery in this case the prosecutor informed the defense counsel that the United States promised Reifler that it would make his cooperation in this case known to the courts and the U.S. Parole Commission. The prosecutor also provided copies of the two letters he had written on Reifler's behalf and Reifler's FBI "rap sheet." The rap sheet showed Reifler's concurrent four-year sentences in the Northern District of Illinois and that they had been reduced.

On direct examination, Reifler testified that the only promise he had received from the prosecutor in this case was that he would make his cooperation known to his sentencing judge in the Northern District of Illinois. Facchiano and the Santos claim that the disclosure here was constitutionally inadequate because it omitted Reifler's concurrent sentences and later sentence reduction. They also claim that Reifler perjured himself when the prosecutor asked him what consideration he had received for testifying and that the prosecutor acquiesced in this perjury, thereby violating *Giglio* and *Napue*.

The district court noted that the discovery order in this case was not issued until five days before trial, and that, although discovery was not complete, the government's disclosure contained substantial information about Reifler which was sufficient to enable defense counsel more fully to investigate Reifler before Reifler's cross-examination.

Additionally, the district court noted that, in a sidebar conference, Facchiano's counsel stated that he was already aware of Reifler's pattern of cooperation in exchange for leniency. The court stated that the evidence of Reifler's cooperation was not newly discovered and that any facts not known to the defense after pretrial discovery were cumulative of impeaching facts already known. The trial court also found no *Brady* violation because Reifler's alleged perjury had "little if any influence upon the jury's judgment," and there was "no reasonable likelihood" that additional testimony concerning leniency would have influenced the jury.

We hold that the trial court did not abuse its discretion in denying the motions for new trial. First, Reifler did not perjure himself. He stated, quite correctly, that the consideration he received in the instant case was that the prosecutor would apprise the sentencing judge in Illinois of his cooperation. That was done. Contrary to Facchiano's and the Santos' claims, the record shows that Reifler's concurrent sentences were a result of his initial plea bargain with an Illinois federal prosecutor in 1976. Reifler's February 1978 reduction in sentence was also unrelated to his testimony in the instant case; the transcript of the sentence reduction hearing shows that he was being rewarded for his cooperation in federal prosecutions in Illinois and in the *Accetturo* case in the Southern District of Florida.

We are faced with a *Giglio/Napue* violation if a government witness gives false testimony concerning consideration he has received from the government, and the prosecutor acquiesces in this testimony by failing to correct it or provide the defense

# 678

with information so that it may do so. In such a case "[a] new trial is required if the false testimony could in any reasonable likelihood have affected the judgment of the jury." *Giglio*, 405 U.S. at 154, 92 S.Ct. at 766; *United States v. Barham*, 595 F.2d 231, 242 (5th Cir.1979), *cert. denied*, 450 U.S. 1002, 101 S.Ct. 1711, 68 L.Ed.2d 205 (1981). In this case the testimony was not false and, considering the abundant evidence presented against the defendants, even if Reifler had perjured himself there was little likelihood that the verdict would have been different.

■ We also find no violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). To establish a *Brady* violation the appellants must prove that the prosecution suppressed or withheld evidence which was favorable and material to the defense. *United States v. Phillips*, 664 F.2d 971, 1025 (5th Cir. Unit B 1981), *cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354, 459 U.S. 906, 103 S.Ct. 208, 74 L.Ed.2d 166 (1982); *United States v. Anderson*, 574 F.2d 1347, 1353 (5th Cir. 1978). *Accord Moore v. Illinois*, 408 U.S. 786, 794–95, 92 S.Ct. 2562, 2567–68, 33 L.Ed.2d 706 (1972). In this case the prosecution did not withhold favorable evidence. The prosecution provided the defense with the two letters written on behalf of Reifler. Because Reifler's 1976 plea bargain for concurrent sentences was unrelated to this prosecution, the prosecution's failure to describe it in detail was not required; it was set out in general terms on the rap sheet the prosecution disclosed. The information contained in the rap sheet also revealed Reifler's sentence reduction in 1978. Moreover, appellants do not claim they were foreclosed from further inquiring into these matters at the *James* hearing. In short, there was no showing in this case that Reifler perjured himself or that the prosecutor intentionally used false testimony. The government's disclosure of exculpatory or beneficial materials was sufficient. Accordingly, we find no fault in the district court's ruling; the *Giglio/Napue* and *Brady* claims must fail.

## V.

For the reasons stated in this opinion, we AFFIRM all convictions, except Francis Santo's conviction on count five, which we REVERSE.